WASHINGTON METROPOLITAN AREA
TRANSIT AUTHORITY, Appellant,

v.

William D. O'NEILL, Appellee.

No. 92–CV–507.

District of Columbia Court of Appeals.

Argued June 9, 1993.
Decided Nov. 24, 1993.
As Amended Dec. 21, 1993.
As Amended on Grant of Rehearing
Feb. 8, 1994.

Gerard J. Stief, Associate Gen. Counsel, with whom Robert L. Polk, Gen. Counsel, and Robert J. Kniaz and Arnold I. Melnick, Deputies Gen. Counsel, Washington, DC, were on the brief, for appellant.

Christopher Schmeisser, with whom Jeremiah C. Collins and P. Michele Ellison, Washington, DC, were on the brief, for appellee.

Before STEADMAN and FARRELL, Associate Judges, and MACK, Senior Judge.

FARRELL, Associate Judge:

The Washington Metropolitan Area Transit Authority (WMATA) appeals from a jury verdict for the plaintiff-appellee in this personal injury case arising from a beating of appellee by other passengers on a WMATA bus. WMATA contends that its sovereign immunity bars this suit, hence that its motion for summary judgment should have been granted. It also contends that appellee failed to prove proximate causation and, by adducing no expert testimony on the appropriate standard of care or a breach thereof, failed in its proof on these issues as well. Finally, WMATA contests the trial judge's decision to award attorney's fees against it as a sanction for an unreasonable filing and the belated disclosure of documents. We reject each of these contentions and affirm.

## I. The Facts

### A. The Assault and Battery

Viewed in the light most favorable to the verdict, the evidence showed that appellee William D. O'Neill, an elderly man, boarded a Metrobus in Georgetown late in the evening of June 30, 1988, and sat down in one of the front seats by the door, facing forward. Two young men pounded on the door as the bus started forward, and the bus stopped to allow Alfred Jones and Willard Mallory [1] to board. The men reeked of alcohol. Their appearance and conduct, including stumbling and boisterousness, also suggested they were drunk or high on drugs.[2] They began arguing about the fare with the bus driver, and Jones walked toward the back of the bus without paying. Mallory eventually paid his own fare and sat down in the rear of the bus.

At the driver's demand, Jones returned to the front of the bus and paid the fare after

---

1. These are apparent pseudonyms for the two men which were used at trial.

2. O'Neill testified that Mallory "was absolutely wild looking. His eyes were glazed and red...."

arguing with the driver. He began walking erratically toward the rear, grabbing the upright poles to maintain his balance. After several steps, he tripped over the leg of a woman seated near the front. He accused her of tripping him, yelled obscenities at her, and demanded an apology.[3] Standing over her, he again demanded an apology in a voice loud enough for everyone in the front of the bus to hear. Although an eyewitness, Rubyline Walton, testified that the driver stood up and told Jones to go to the back of the bus and sit down, another eyewitness denied that the driver said anything to Jones at this time.

For as much as several minutes, Jones walked up and down shouting obscenities at passengers, then went to the back of the bus. A short time later, however, he walked toward the front of the bus and again stood in front of the woman, this time pushing his crotch toward her face and yelling lewd and threatening remarks.[4] Mallory, in the meantime, had been making menacing faces at passengers in the back. Frightened by this behavior, a second woman went to the front of the bus and asked the driver to eject the men from the bus. When the driver refused,[5] the woman got off at the next stop.

Jones continued to pace and repeat his obscene remarks. When he returned to the back of the bus, O'Neill asked the driver to do something about him. The driver refused, saying his job was to drive the bus and that the emergency phone was not working. Hearing this exchange, Jones shouted to O'Neill, "What's it to you, old man," and returned to the front of the bus. First he bent over the woman he had threatened earlier and repeated the threat to kill her. Then he sat down behind O'Neill and, in a loud voice, threatened to kill him as well,

before bending over the woman and threatening her once more.

Jones then sat down behind O'Neill, grabbed him and poked at his nose, and said repeatedly, "[D]o you want to die?" and "kill, kill." The driver heard these threats and saw Jones point his finger in O'Neill's face for as long as thirty seconds.[6] Jones pointed at yet another woman and threatened to kill her too. When O'Neill tried to get up, Jones grabbed him and O'Neill struggled to get away. The driver slammed on the brakes, causing Jones and O'Neill to fall backwards. Mallory then jumped up and began striking O'Neill in the face. The driver activated the silent alarm and flashing lights to summon police assistance. An ambulance arrived almost immediately, followed a minute later by the police. O'Neill's face was caved in, he suffered a broken nose and jaw, and he was hospitalized for eight days. He also suffered brain and spinal cord injuries and was unable to work for ten weeks.

Altogether, ten minutes or more elapsed between the entry of the bus by Jones and Mallory and the beating of O'Neill.

### B. Evidence of WMATA's Safety Procedures

Besides calling WMATA supervisory employees as witnesses, O'Neill introduced documentary evidence of WMATA's safety directives to its bus drivers and the prescribed use of bus security devices. WMATA's "System Safety Program Plan" emphasizes "preventive measures over corrective measures." The plan includes directives issued to bus drivers, as outlined in the Handbook of Rules and Regulations and the Manual of Rules. Rule 74(e) stipulates that a driver has a duty to "preserve order and protect passengers

---

3. Jones stated: "If I stick my dick out would you apologize then?" and "Fuck you, bitch."

4. Jones yelled: "I know what you want. You want to suck my dick," "You want to suck my dick and I'm going to make you," and "I suppose you would like to suck my dick in your mouth. Do you want to die? Do you want to be killed, bitch? I'm going to kill you."

5. The driver testified, "I told her that I could not eject the men off the bus because ... they had

not done anything physical to anyone by cussing...."

6. According to a police officer who debriefed the driver at the scene, the driver agreed that Jones had said: " '[W]hat do you want old man, do you want to die? Do you want to die? I'm going to kill you. Do you want to be killed?' and at that point he was screaming [at O'Neill], he was face to face just about touching noses, he was poking him in the face or the head area with his fingers."

from insult, violence, or injury while in his charge." Specifically, the driver must keep a watchful eye on a disruptive passenger and instruct him to stop any offending conduct. If the passenger refuses, the driver must ask him to leave the bus, but may not physically eject him unless there is immediate physical danger. James Pittman, assistant superintendent of WMATA, testified by deposition that the rules require drivers to order a passenger to leave the bus if he does not stop harassing passengers, although Pittman stated he would not do this if the passenger were hostile.

All WMATA buses are equipped with external flashing alarm lights, consisting of eight lights along the top of the bus. The lights allow drivers to visually signal police officers that the driver needs assistance, and all police understand the meaning of the flashing lights. The rules require drivers to activate these lights "when conditions exist within the bus that require the assistance of law enforcement officers," as when a passenger is "smoking, eating, or [engaged in] any violation of conduct ordinances." Leroy Bailey, assistant general manager for bus service and head of the bus division, testified by deposition that drivers are instructed to activate the alarm lights if there is clear evidence of harassment. Each bus also contains a silent alarm, triggered by a button on the bus radio, which sends a signal to WMATA's station controller, who in turn calls the transit police and, through them, the Metropolitan Police. "Notice[s] to Operators" issued in 1986 and again in 1990 require drivers to activate the silent alarm in emergencies, including situations that involve threats of bodily harm. Pittman acknowledged that he would have used the silent alarm when Jones made the first obscene remarks to the woman passenger.

Finally, O'Neill presented evidence that the police could have responded to the lights or the silent alarm quickly. Georgetown was well patrolled by police on the night of the incident, and Officer Brown arrived at the bus within five seconds after receiving the radio call. Brown was patrolling Georgetown and was in the vicinity of the bus during the entire sequence of Jones's assaultive behavior.

## II. WMATA's Claim of Immunity

### A.

By the terms of the Compact creating it, WMATA is subject to suit for the alleged negligence of its employees only if the tort was "committed in the conduct of any proprietary function...." D.C.Code § 1-2431(80) (1992). Conversely, WMATA is immune from suit if the negligence "occurr[ed] in the performance of a governmental function." *Id.* WMATA asserts that the bus driver's response to the behavior of Jones and Mallory leading to the beating of O'Neill involved police-type activity and the exercise of a governmental function, thus barring appellee's suit. We disagree.

■ We have held that, in general, the provision of mass transportation is a proprietary function within the meaning of the WMATA Compact, *Qasim v. WMATA,* 455 A.2d 904, 906 (D.C.) (en banc), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2090, 77 L.Ed.2d 300 (1983), and that "WMATA, like any common carrier, owes a duty of reasonable care to its passengers." *McKethean v. WMATA,* 588 A.2d 708, 712 (D.C.1991). But in establishing WMATA as a common carrier, the creating jurisdictions did not intend to expose it to liability coextensive with that of a private carrier; otherwise the governmental-proprietary distinction of the Compact would have no meaning. Therefore, in *McKethean,* we looked for a standard by which to determine which activities of WMATA's officers or employees implicate its "duty of reasonable care to its passengers" and hence subject it to tort liability; and which do not. Finding too broad in many applications a test of whether the activity was for the "common good" (rather than motivated narrowly for "corporate benefit or pecuniary profit"), we agreed with a decision of the United States Court of Appeals for the District of Columbia Circuit that

the more appropriate inquiry is whether a particular activity involves a legislative, administrative, or regulatory policy decision or merely implements such a decision. Only the former type of action, a policy

decision, is a "discretionary function" which should be immune from second-guessing by a jury.

*Id.* at 713 (citing and quoting *Sanders v. WMATA,* 260 U.S.App.D.C. 359, 362–64, 819 F.2d 1151, 1154–55 (1987)). Relying on *Sanders* and previous federal decisions reaching back to *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) (construing Federal Tort Claims Act),[7] we concluded that in most instances

> the issue of WMATA's immunity comes down to a question of whether its alleged acts of negligence are characterized as discretionary decisions or ministerial execution of those decisions.

*Id.* at 713 (footnote omitted).[8]

In *McKethean,* "the gist of appellants' complaint ... [was] that WMATA was negligent in not relocating [a] bus stop to a safer place" after a 1967 street widening had allegedly made the existing stop a hazard. While reiterating that WMATA's provision of mass transportation "is itself a proprietary activity," we held that

> the design and planning of a transportation system are governmental activities because they involve quasi-legislative policy decisions which are discretionary in nature and should not be second-guessed by a jury. *Only the negligent operation of such a system* or the negligent implementation of such a design *may be characterized as proprietary.*

*Id.* at 713–14 (emphasis added; citations omitted).

**B.**

The acts (or inaction) of the bus driver alleged in this case cannot by any stretch of reason be said to involve "quasi-legislative policy decisions which are discretionary in nature," rather than conduct "implement[ing] such ... decision[s]." Nor are we convinced by appellant's argument that because O'Neill claimed essentially that WMATA failed to protect him from a criminal attack by third persons, his suit fails under the settled principle that "the operation of a police force is a governmental function." *Martin v. WMATA,* 667 F.2d 435, 436 (4th Cir.1981) (citation omitted).

O'Neill alleged that the bus driver was negligent in not following WMATA's safety directives—rules which define the appropriate standard of care in this situation. O'Neill does not challenge the adequacy of the rules themselves. Hence his suit does not interfere with WMATA's judgment as to the appropriate response, or gradation of responses, to be followed by its drivers in dealing with disruptive passengers. Indeed, O'Neill's claim was that while WMATA instructed its drivers in an array of steps for responding to such conduct, the driver was negligent by not reacting at all or by doing so too late. WMATA points to the judgment its drivers must exercise in these situations, but WMATA's safety directives do not leave the drivers unbridled discretion in dealing with unruly passengers. While drivers are expected to avoid unnecessary use of the silent alarm, they are instructed to activate the external alarm lights when a passenger violates any of the conduct ordinances or

**7.** Our reliance on federal decisions was not surprising: "[w]hether an activity is proprietary or governmental is a question of federal law because the WMATA Compact is an Act of Congress." *McKethean,* 588 A.2d at 712.

**8.** We recognized, to be sure, that "the governmental-proprietary test as set out in section 80 of the WMATA Compact is not necessarily congruent with the discretionary-ministerial test which we apply to tort claims against the District [of Columbia]." *McKethean,* 588 A.2d at 713 n. 4 (citing, *inter alia, Wade v. District of Columbia,* 310 A.2d 857, 860 (D.C.1973) (en banc)). *See also Hall v. WMATA,* 468 A.2d 970 (D.C.1983) (rejecting argument that court should "abandon" governmental-proprietary test in favor of discre-

tionary-ministerial test in deciding whether an arrest by WMATA transit police, a classic "governmental" function yet a "ministerial" act when performed by a District police officer, was within the scope of WMATA's sovereign immunity). Still, we agreed with the D.C. Circuit that "the 'discretionary function' standard is at least a subset of 'governmental functions,' " *McKethean,* 588 A.2d at 713 n. 4 (quoting *Sanders,* 260 U.S.App.D.C. at 363 n. 9, 819 F.2d at 1155 n. 9), so that it is "appropriate to speak of acts as 'discretionary' or 'ministerial,' even when applying the governmental-proprietary test." *Id.* On the facts of *McKethean,* "the analysis under both tests [was] the same," *id.,* and we reach the same conclusion in this case.

harasses another passenger, and are to activate the silent alarm upon observing "threats of bodily harm." At a minimum, unless this would exacerbate the situation, they are instructed to order disruptive passengers to leave the bus if they do not stop the abusive conduct. In short, the drivers are not "directed to be negligent" in carrying out the passenger safety rules, *Sanders v. WMATA*, 260 U.S.App.D.C. at 359, 819 F.2d at 1156, and it is that negligence which O'Neill alleged.

Beyond this, the discretion WMATA's drivers retain as to the proper means of handling disruptive conduct cannot be considered a "discretionary function" of the kind that, because it involves judgments at the policy and planning level, "should be immune from second-guessing by a jury." *McKethean*, 588 A.2d at 713. "The fact that in a particular case a bus driver might have alternative courses of action from which to choose and this choice might involve a certain degree of judgment, does not elevate the driver's decision to the level of 'basic policy.'" *Lopez v. Southern California Rapid Transit*, 40 Cal.3d 780, 221 Cal.Rptr. 840, 849, 710 P.2d 907, 916 (1985).[9]

Nor does it change our analysis that, as WMATA points out, its safety rules are "an initial system for patron protection which ultimately results in *police protection*" (emphasis added), the latter being a classic governmental function. *Hall, supra* note 8, 468 A.2d at 973; *see* E. McQUILLIN, THE LAW OF MUNICIPAL CORPORATIONS, §§ 53.29, 53.30 & 53.31 (3d ed. 1993). Just because measures such as ordering a passenger to leave the bus or triggering an alarm "would have the effect of *protecting* passengers from *criminal* assaults does not transform them into 'police protection services.'" *Lopez*, 221 Cal.Rptr.

at 848, 710 P.2d at 915 (emphasis in original). O'Neill's suit did not require the driver to have acted as a police officer; it alleged that he failed to *summon* the police by the means available to him and in which he had been instructed, or to take lesser steps such as ordering the men to stop their behavior or leave the bus. What the California Supreme Court has stated applies similarly to this case:

> Plaintiffs' complaint does not allege, nor do plaintiffs argue that RTD [the transit authority] was negligent in failing to provide police personnel or armed guards on board its buses. Rather, the gravamen of plaintiffs' complaint is that the bus driver, who was already hired by RTD and was present on the scene and aware of the violent disturbance, did absolutely nothing to protect plaintiffs, but simply continued to drive the bus as if nothing was wrong.

*Id.* 221 Cal.Rptr. at 847, 710 P.2d at 914.

In sum, WMATA's sovereign immunity did not bar this suit premised on the alleged negligence of its driver in carrying out express safety directives intended for the protection of its passengers.[10]

### III. Proximate Cause

■ WMATA contends that, notwithstanding any negligence on its driver's part, the intervening criminal conduct of Jones and Mallory amounted to a superseding cause that, as a matter of law, broke the chain of causation and frees WMATA of liability. Our standard of review here is well established: "[O]nly ... where it is clear that reasonable [people] could draw but one conclusion from the facts alleged [does] ... proximate cause become [a] question[ ] of law." *Grant v. District of Columbia*, 597 A.2d 366, 370 (D.C.1991) (citation omitted).

---

9. *See also Sami v. United States*, 199 U.S.App. D.C. 173, 184 n. 18, 617 F.2d 755, 766 n. 18 (1979) (quoting *Swanson v. United States*, 229 F.Supp. 217, 219–20 (N.D.Cal.1964)):

> In a strict sense, every action of a government employee, except perhaps a conditioned reflex action, involves the use of some degree of discretion. The planning level notion refers to decisions involving questions of policy, that is, the evaluation of factors such as the financial, political, economic, and social effects of a given plan or policy.

10. The two cases chiefly relied on by WMATA, *Southeastern Pennsylvania Transp. Auth. v. Hussey*, 138 Pa.Cmwlth. 436, 588 A.2d 110 (1991), and *Weiner v. Metropolitan Transp. Auth.*, 55 N.Y.2d 175, 448 N.Y.S.2d 141, 433 N.E.2d 124 (1982), are both inapposite. *Hussey* involved no application of express safety regulations governing mass transportation; and in *Weiner* the complaint alleged inadequate police protection in the subway.

And we must view the evidence most favorably to O'Neill, crediting all evidence that would establish causation. *District of Columbia v. Davis,* 386 A.2d 1195, 1200–01 (D.C.1978).

■ "A common carrier is required to protect its passengers against assault or interference with the peaceful completion of their journey." *Matthews v. Southern Ry. Sys.,* 81 U.S.App.D.C. 263, 264–65, 157 F.2d 609, 610–11 (1946). "If the danger of an intervening negligent or criminal act should have reasonably been anticipated and protected against, the defendant will be held responsible for the damages which result despite the entry of another act in the chain of causation." *St. Paul Fire & Marine Ins. Co. v. James G. Davis Constr. Corp.,* 350 A.2d 751, 752 (D.C.1976). It is true that, when the intervening act involves *criminal* rather than negligent conduct by a third party, "[t]he question is not simply whether a criminal act is foreseeable, but whether a *duty* exists to take measures to guard against it." *Cook v. Safeway Stores, Inc.,* 354 A.2d 507, 509 (D.C. 1976) (citation and internal quotation marks omitted; emphasis in original). But where a special relationship exists, such as between a common carrier and its passengers, the carrier undeniably has a duty to protect its passengers from foreseeable harm arising from criminal conduct of others. RESTATEMENT (SECOND) OF TORTS § 314A(1)(a) and comments d, e; § 302B (1965).[11] The RESTATEMENT gives an illustration of this principle similar to the facts of this case:

> The A Railway Company permits a number of drunken rowdies to ride in its day coach. No effort is made by the conductor or train crew to eject them, although their conduct is insulting and threatening to the other passengers. One of the rowdies attempts to take liberties with B, a female passenger, and in the scuffle harms her.

The intentional misconduct of the rowdy is not a superseding cause of B's harm. *Id.,* § 449 comment b.

■ The evidence here established that Jones paced the bus in an apparently drunken state for ten minutes or more, during which he was permitted to make obscene and increasingly threatening remarks to other passengers. This was time enough for a woman passenger to ask the driver to intervene (and to leave the bus when he failed to do so) and for O'Neill to make a similar demand after witnessing additional abusive behavior. Jones then sat down behind O'Neill for nearly a minute and cursed at him and pointed his finger in his face. On these facts, the jury could fairly conclude that the eventual beating of O'Neill was not something the driver "could not reasonably have anticipated."[12] *District of Columbia Transit Sys., Inc. v. Carney,* 254 A.2d 402, 404 (D.C. 1969). It also could properly find that the driver should have switched on the flashing lights or the silent alarm, or both, well before Mallory beat O'Neill; or, at a minimum, that he should have stopped the bus and ordered the pair to desist or else leave the bus. (Jones, we note, had obeyed the driver's earlier order to return to the front of the bus and pay the fare). Thus, the chain of causation leading to the battery on O'Neill was not "highly extraordinary in retrospect," *Lacy v. District of Columbia,* 424 A.2d 317, 320–21 (D.C.1980), and the jury's finding on this issue must be sustained.

■ WMATA also attacks the jury's implicit finding that if the driver had triggered either of the alarms, or both, the police could have arrived in time to prevent the assault. This argument assumes, first, that the negligence found by the jury consisted only of failure to trigger the alarms; but, as we have seen, the jury could reasonably find that it

---

11. "[V]irtually all courts and all commentators who have considered the issue have concluded that a common carrier's duty to its passengers includes a duty to protect them from assault by fellow passengers." *Lopez,* 221 Cal.Rptr. at 843, 710 P.2d at 910.

12. WMATA asserts it was unforeseeable that *Mallory* would come to the front of the bus and attack O'Neill, since he had stayed in the back

while Jones threatened the woman passenger in the front. But this ignores the fact that the two men boarded the bus together in a drunken state, and that while Jones harassed passengers in the front, Mallory did so in the back. It was thus not unforeseeable that Mallory would come to Jones's aid in any altercation with a passenger, nor that either of them would progress from threatening passengers to attacking them.

was the driver's failure to do anything, including asking the men to stop or else leave the bus, that amounted to negligence. Moreover, in estimating reasonable police response time, WMATA posits the wrong time frame by isolating "the 45 seconds to a minute window after Jones turned his attention to Plaintiff and before the punches [were] thrown." This ignores the preceding ten minutes (or only slightly less) of increasingly menacing behavior that led up to the battery. There was sufficient evidence for the jury to find that police in the Georgetown neighborhood could have reached the bus well within the ten minute or longer period.

## IV. Absence of Expert Testimony

■ WMATA contends that O'Neill was required to present expert testimony on whether the bus driver "acted reasonably" in exercising his discretion to activate the alarms, since that decision was "not one within the realm of the everyday experiences of a lay person." *Hughes v. District of Columbia,* 425 A.2d 1299, 1303 (D.C.1981). This argument fails for at least two reasons. First, as already discussed, WMATA's safety rules restrict its drivers' discretion on what to do when a passenger is being harassed or threatened by another rider. To that extent the rules themselves provide evidence of the standard of reasonable care. Second, it is not beyond the ken of an average juror to apply that standard to particular conduct—to decide whether the driver followed ordinary care in the circumstances in responding to disruptive conduct.[13] The jury was fully informed of the rules guiding the conduct of WMATA's drivers in the circumstances presented; it needed no additional expert instruction in applying them to the facts of this case.[14]

## V. Discovery Sanctions

■ Finally, WMATA challenges the trial judge's grant of attorney's fees to O'Neill as a sanction for certain pretrial conduct. The trial judge awarded O'Neill fees after WMATA filed a supplemental brief (or "reply") in support of its motion for summary judgment based upon an outdated and previously undisclosed notice of safety procedures.[15] The belated disclosure of this notice also caused the judge to reopen discovery at O'Neill's request, and during this discovery WMATA produced seventeen additional documents for the first time, which required further pretrial preparation by O'Neill's attorneys and resulted in an additional award of attorney's fees. The judge found that WMATA was "gross[ly] negligen[t]" in not complying with discovery, in consequence of which O'Neill had "been placed under tremendous pressure in prepar-

13. We do not hold WMATA to a duty "to use *utmost* care and diligence" in protecting its passengers from assaults by other riders. *Lopez,* 221 Cal.Rptr. at 843, 710 P.2d at 910 (emphasis added). The standard is reasonable care in the circumstances. This takes into account, on the one hand, the fact that "passengers have no control over who is admitted on the bus and, if trouble arises, are wholly dependent upon the bus driver to summon help or provide a means of escape," *id.* 221 Cal.Rptr. at 845, 710 P.2d at 912; and, on the other hand, that the job of the driver is to drive the bus, not act as a policeman. WMATA "is not an. insurer of the safety of its passengers." *District of Columbia Transit Sys., Inc. v. Carney,* 254 A.2d at 403.

14. WMATA cites no authority suggesting that its safety directives and the testimony of its supervisors explaining them was insufficient to convey the necessary "expertise" to the jury. The citations it does provide are inapt. To point out, as WMATA does, that the average juror has never driven a bus or had to engage in "passenger control" on a bus is not like acknowledging that the average person is unfamiliar with matters of prison management and prisoner control, *District of Columbia v. Carmichael,* 577 A.2d 312 (D.C.1990); *Hughes v. District of Columbia, supra,* or with the proper procedures for administering cardiopulmonary resuscitation, *Toy v. District of Columbia,* 549 A.2d 1, 7 (D.C.1988), or with reconstruction of automobile collisions. *WMATA v. Davis,* 606 A.2d 165, 170 (D.C.1992). Jurors can be assumed to have ridden buses; to understand and sympathize with the fact that a driver's primary duty is to "drive the bus"; and yet to have the common sense and experience—aided by knowledge of WMATA's own directives—to enable them to decide whether a driver has taken reasonable steps to prevent a foreseeable act of violence.

15. The trial judge found that this notice, issued to bus drivers in May 1978, had been superseded by notices issued in March 1986 and July 1990. The May 1978 notice stated that the silent alarm was to be used only for threats of bodily harm where weapons were present; the later notices appeared to call for its use in dealing with "threats of bodily harm."

ing for trial and [had] incurred attendant and unnecessary expenses."

■ WMATA contends that the judge erred "[a]s a threshold matter" by awarding attorney's fees under Super.Ct.Civ.R. 11 rather than Rule 37. We do not agree with WMATA that the judge "decid[ed] the matter under Rule 11." To be sure, a portion of the fees awarded was for "costs associated with [O'Neill's] filing of an opposition to [WMATA's] motion for summary judgment which was based on outdated information." Rule 11 was the proper basis for that sanction. *See Kleiman v. Aetna Casualty & Sur. Co.,* 581 A.2d 1263, 1266 (D.C.1990). The bulk of the fees the judge awarded, however, were for what she plainly described as WMATA's negligence in performing its discovery obligations. Although the judge did not cite to Rule 37, her citation to *Weiner v. Kneller,* 557 A.2d 1306 (D.C.1989), leaves no doubt that she exercised her discretion under that rule. WMATA argues that fees may not be awarded against it under Rule 37, citing Rule 37(f) ("Except to the extent permitted by statute, expenses and fees may not be awarded against ... the District of Columbia under this Rule"). WMATA may or may not be correct in equating itself with "the District of Columbia" under the rule, but we decline to reach the contention because it is raised for the first time in WMATA's petition for rehearing and rehearing en banc. *Cf. District of Columbia v. Murphy,* No. 92–CV–283, slip op. at 5 (D.C. December 29, 1993); *Keating v. Federal Energy Regulatory Commission,* 288 U.S.App.D.C. 344, 353–54, 927 F.2d 616, 625–26 (1991). Nor did the trial judge otherwise abuse her discretion.[16] The importance WMATA attaches to the judge's finding that its late disclosure of the documents was not "willful" is misplaced, especially given the finding of gross negligence. Willfulness is not required to support a sanc-

tion of attorney's fees under Rule 37. *E.g., Ungar Motors v. Abdemoulaie,* 463 A.2d 686, 688 (D.C.1983) ("The fact that appellant, possibly through its own negligence, failed to comply with the discovery request was sufficient to justify the imposition of some sanction by the trial court" (footnote omitted)).

*Affirmed.*

MACK, Senior Judge, dissenting:

Let me start with the obvious. The basic issue before us is not a criminal one but a civil one, namely the financial liability of a federally-authorized tri-state/district transportation entity for injuries to a bus passenger as a result of a criminal act committed by third parties. Moreover, this is not a "simple negligence case," as appellee's counsel would have us believe. Quite apart from the transcript, an avalanche of papers that comprise the record in this case (motions, responses, oppositions, statements, memoranda, interrogatories, exhibits, stipulations, depositions, etc.) attests to the complexity of the issues of law and fact. There is a legal question of governmental immunity before us, as well as a factual issue of the validity of a jury finding of negligence.

I.

In its decision today, the court constricts the holding of *McKethean v. WMATA,* 588 A.2d 708 (D.C.1991). While the majority's narrow statement of the distressing facts may support a jury verdict, it does not follow that the verdict compels a finding of liability on the part of WMATA. Under the "imputation of negligence from agent to principal" theory appellee employs here, the facts must be viewed in their totality, not merely in the light most favorable to the verdict. Appellee, by focusing his claim on the bus driver's behavior, diverts the court's attention from

16. O'Neill had asked in discovery for "any and all documents ... which relate or refer to the measures used by WMATA to protect its passengers." WMATA's supervisor Bailey testified that if he had initially received a request worded in this manner from WMATA's attorneys in this case, he would have provided all documents relating to the bus alarm systems, including those

furnished to O'Neill only after discovery had been reopened. In fact, however, WMATA's attorney had specifically asked him only for the 1978 notice of safety procedures. The judge's finding that O'Neill had been put to considerable additional expense by the late disclosure of seventeen documents relevant to WMATA's liability is supported by the record.

the threshold issue in this case, the adequacy of WMATA's safety plan and directives, and the scope of WMATA's immunity from tort liability.[1] Viewed in its proper light, this case should have never been presented to a jury.

The chain of events that culminated in a criminal assault by third parties took place over a ten minute period which began with an occurrence that is undoubtedly quite familiar to this city's public bus drivers—two drunk trouble-bound youths boarding a bus in the Georgetown area of this city in the late evening hours of a summer night. In this instance, one of them in route to the rear of the bus, stumbles. He accuses a young woman in the front of the bus of having tripped him, and then directs an obnoxious, obscene, and threatening verbal tirade toward her.

The driver, continuing his route while keeping a watchful eye on the hostile youth,[2] turns around at least once (possibly twice, according to his own testimony and that of an eyewitness)[3] and requests that the youth go to the back of the bus and sit down. (The second youth remains seated in the rear of the bus, outside the view of the driver, "making faces.") In response to the driver's directive, the first youth initially retreats to the back of the bus, but then returns to continue his tirade against the woman he accused of tripping him.

When the first youth overhears appellee request that the driver expel the youths from the bus, he turns his hostile attentions to appellee. After 30 seconds during which he verbally threatens appellee from close range, the bus driver sees the youth touch appellee's nose with his finger. The driver imme-diately slams on the brakes (causing both men to fall) and activates both the flashing lights and the silent alarm which summoned nearby police. In the ensuing struggle, the second youth comes forward and administers a brutal beating, causing serious injury to appellee.

## II.

In *McKethean v. WMATA*, 588 A.2d at 708, a case in which the careening automobile of a drunken motorist caused the tragic death or severe injury of nine would-be passengers at a bus stop, we discussed the unique (and, at times, confusing) governmental/proprietary legal status of WMATA. In rejecting the claim that WMATA had been negligent in failing to take safety precautions with respect to the design of the bus stop, we held that the design function is within the "discretionary" (immunized) sphere of WMATA's actions. *Id.* at 713 n. 4.[4] We noted that actions taken with respect to the operation and maintenance functions of WMATA are "ministerial" (non-immunized)—implicitly including within this sphere the actions of an employee who causes an injury by negligent operation or maintenance of a WMATA vehicle. However, we limited the liability of WMATA to those instances in which "the injury alleged is *directly attributable* to negligent maintenance and operation, and not to negligent or faulty design." *McKethean,* 588 A.2d at 714 n. 6 (quoting *Dant v. District of Columbia,* 264 U.S.App.D.C. 284, 829 F.2d 69 (1987) (emphasis added)).

My colleagues state that the *"discretion* WMATA's *drivers* retain as to the proper means of handling disruptive conduct cannot be considered a 'discretionary function'"

1. The majority recognizes the difficulty appellee would have had in the event that he structured his claim so as to challenge the safety procedures themselves, stating:
   O'Neill does not challenge the adequacy of the rules themselves. Hence his suit does not interfere with WMATA's judgment as to the appropriate response, or gradation of responses, to be followed by its drivers in dealing with disruptive passengers.

2. This assertion is plausible since the 47 year-old-driver had driven trucks for some 32 years, including tractor trailers for 28 years, before being hired by WMATA.

3. My colleagues acknowledge the conflict in eyewitness testimony but suggest that we interpret

the evidence in the light most favorable to the jury's verdict. The general verdict tells us very little about what the jury (which, as I have noted, should not have heard the case in the first instance) concluded with respect to an order or request. The jury here was instructed that the issue "in this case is whether the bus driver executed his common law duty of care and followed the rules and regulations promulgated by the Washington Metropolitan Area Transit Authority" (defined as a "common carrier").

4. It is appropriate to speak of acts as "discretionary" or "ministerial" even when applying the governmental/proprietary test. *See McKethean, supra* at 713.

such that it is immunized from liability. (Emphasis added.) This language speaks for itself. I believe that WMATA's choice, as an organization, to design its safety system so as to necessarily afford its drivers a reasonable degree of discretion in dealing with unruly passengers *does* constitute a discretionary (immunized) decision under the terms of *McKethean.* And, because I find that the bus driver's actions were within the sphere of discretion allowed him under WMATA's safety design (*see* my discussion, *infra*), I cannot conclude that the injury alleged here was *directly attributable* to the driver's negligent implementation of it.

### III.

If I were to adopt my colleagues' legal conclusion that WMATA's sovereign immunity did not protect it in this instance, I would nevertheless find that the WMATA driver was not negligent.

The duty of a common carrier with regard to passenger safety is the exercise of "reasonable care." *District of Columbia Transit System, Inc. v. Carney,* 254 A.2d 402, 403 (D.C.1969); *see also* RESTATEMENT (SECOND) OF TORTS § 314A(1) (1965). The mere fact that an assault occurred on a bus is not enough to establish a breach of the standard of reasonable care, for a "common carrier is not an insurer of the safety of its passengers." *District of Columbia Transit System,* 254 A.2d at 403. The common carrier's duty to act arises only when the risk to a passenger becomes an "unreasonable" one. RESTATEMENT (SECOND) OF TORTS, *supra,* comment e.

The appellee's claim (as stated by the majority) is that the driver breached his duty of reasonable care by "not reacting at all or by doing so too late." But the facts do not support this claim. The driver *did* react. By his own account, which was corroborated by one of the witnesses, the bus driver responded to the youth's verbal attack on the woman he accused of tripping him, by turning around and asking the youth to go to the

back of the bus. He kept the youth under observation. He abruptly stopped the bus the instant the physical touching of appellee occurred and immediately activated the alarm system to summon police.

I believe that a bus driver, in the situation presented by this case, could reasonably conclude that the verbal threats of an unarmed and apparently incapacitated youth, although obnoxious, did not rise to the level of a real danger to passenger safety until an actual touching occurred. Indeed the driver testified that he considered himself in control of the situation until he observed the touching. This conclusion was reasonable in view of the fact that he knew that police were nearby and that he had been warned against unnecessary use of the alarm. Appellee concedes in his brief that since the Georgetown area is so heavily patrolled, police assistance would not have been necessary to abate the disruptive behavior and adds that all the driver would have had to do was to tell the first youth to sit down.

This case is distinguishable on its facts from *Lopez v. Southern California Rapid Transit,* 40 Cal.3d 780, 221 Cal.Rptr. 840, 710 P.2d 907 (1985), the California case cited by the majority.[5] There, a bus driver working a route that the court specifically noted was known to be particularly dangerous (violent incidents occurred with daily or weekly frequency) did absolutely nothing as a verbal altercation escalated into a physical assault. In *Lopez,* the threshold level of danger necessary to find "unreasonable risk" and necessitate action, was lower than it is on the facts presented in the instant case. The case is instructive, however, in its attention to surrounding circumstances in determining when action is required.

### IV.

My colleagues cite WMATA safety policy directives as evidence of the standard of care applicable here, and conclude that the driver failed to fulfill his duty to passengers. I do not agree. Indeed WMATA's directives to bus drivers are geared to the recognition that drivers are its link to the public.

These directives recognize that with respect to safe operation and maintenance, the

---

5. The *Lopez* case is also distinguishable legally, in that the *Lopez* court was interpreting a provision of the California Code which specifically placed upon common carriers a heightened duty

of "utmost care" in protecting its passengers from harm. Here we are interpret a compact authorized by the Congress which does not contain such a specific provision.

bus driver plays a most significant role. The driver is also "The Ambassador" who is WMATA's link to the public—the public which views an operator not as a representative of the company but as "The Company." He or she is expected to be well-groomed, courteous, patient, attentive, and well-mannered. Over the years forcible ejection has been generally discouraged—at one time prohibited—even with respect to passengers who refused to pay a fare or who were under the influence of alcohol. Passengers may be forcibly ejected for dangerous, disorderly or offensive conduct but only as a last resort and after following procedures such as enlisting witnesses. An employee may use force only to repel an attack against himself or herself. With respect to criminal activity, a bus driver is not to directly perform a police function but is to' cooperate with police in insuring safety. WMATA's procedures governing bus driver response to disruptions on the bus have been modified over time and, of necessity, allow significant discretion to the driver.

Thus in 1978, a "Notice to Operators" announced that a silent alarm system would become operative enabling drivers to summon police. Its use was prohibited for any occurrence other than:

1. An actual physical assault on operator or passenger(s).

2. A threat of bodily harm where knives, guns, or weapons are displayed or otherwise in evidence.

3. Robbery where the use or threat to use force and/or violence is apparent or clearly indicated.

4. Physical harassment of passenger(s)/employee(s) by a gang (3 or more persons).

In 1986,[6] the same year that the bus driver in this case was hired by Metro, a "Notice to Operators" expressed concern about the abnormal number of silent alarm reports and

cautioned that operators should use the alarm only when there is a REAL emergency defined as:

1. Assault
2. Threat of bodily harm
3. Robbery
4. Acute illness/injury.

Appellee may take some solace from the change in the wording of the directives. Nevertheless, in this quickly developing and unforeseeable situation, it is difficult to conclude that the driver's responses were unreasonable in light of those directives and overall policies.

Moreover even if I were to agree, for the purposes of argument, that the driver breached his duty of care, I would remain unconvinced that appellee has proved that the breach was the proximate cause of his injuries. Here, there was an intervening criminal act. Such acts break the chain of causation absent a "more heightened showing of foreseeability." *See McKethean,* 588 A.2d at 716.

On the facts presented here, I do not find the heightened foreseeability necessary to sustain the chain of causation through the commission of the criminal act. According to all accounts, the young man who administered the brutal beating was not the one who paced the aisle of the bus making verbal threats to passengers; rather he sat in the back of the bus outside the range of the driver's vision, making, by trial accounts, menacing faces. The fact that the unruly youths were inebriated and exhibited no weapons, weakened, rather than strengthened, awareness of their intent or ability to seriously assault other passengers. And, unfortunately, the frequency with which individuals verbally insult and threaten others in the public spaces of our city diminishes the expectation that such behavior is necessarily a precursor to physical assault.

## V.

Finally, I believe it is unfair by "second guessing" and after-the-fact rigid construction of policy to place upon a driver, unarmed

---

6. Meanwhile in 1981, a "Notice to Operators" informed drivers of a "Metro Passenger Conduct Ordinance" prohibiting such activities as smoking, eating, refusing to pay a fare, and littering. Drivers were to report incidents of these activities to the police for prosecution if the offending passenger refused a polite request to cease and desist. Violations of the conduct ordinances were listed as an example of appropriate cause for activation of flashing lights while the bus continued toward its destination; the lights were to be used not as a substitute for the silent alarm but simultaneously with it.

and untrained in police procedures, the brunt of society's burden in coping with burgeoning crime. This is asking too much even of a good-will "ambassador" of a transit system. It is unreasonable to conclude that while armed Metro police (functioning under the WMATA compact) are embraced by the status of immunity (*see, e.g., Hall v. WMATA,* 468 A.2d 970, 973 (D.C.1983)), unarmed bus drivers cooperating with police to deter criminal activity are not so embraced. While the theory of imputing liability from agent to principal might have the desired effect of making a victimized bus passenger whole, it must be balanced against the undesired effect of limiting the discretion of the agent and thus exposing the driver and other passengers to risks of still greater escalating violence, and ultimately injury. Under the circumstances here, the fact that the driver activated the alarm systems only when verbal threats turned to a physical touching did not constitute negligence.

I would hold that *McKethean* dictates that the WMATA compact itself renders WMATA legally immune from this claim.