Rebecca **ROBINSON**, et al., Appellants,

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellee.**

No. 94–CV–1474.

District of Columbia Court of Appeals.

Argued April 11, 1996.

Decided May 23, 1996.

Thomas W. Ullrich, Washington, DC, for appellants.

Mark F. Sullivan, Assistant General Counsel, with whom Robert L. Polk, General Counsel, and Robert J. Kniaz, Deputy General Counsel, were on the brief, for appellee.

Before STEADMAN, FARRELL, and REID, Associate Judges.

FARRELL, Associate Judge:

This appeal is from the grant of a motion for judgment notwithstanding the verdict in a suit by plaintiff-appellant against appellee Washington Metropolitan Area Transit Authority (WMATA) alleging negligence by a WMATA Metrorail station manager in failing to intervene while witnessing a criminal assault on plaintiff Rebecca Robinson by a third person. The jury found negligence and awarded Ms. Robinson and her husband damages. The trial judge set aside the verdict on WMATA's post-trial motion for judgment, concluding that while the jury reasonably could have found the station manager negligent in failing to summon the WMATA transit police or other law enforcement officers, there was no evidence that the police could have arrived within the at most two-minute time frame of the assault and prevented Ms. Robinson's injuries;[1] and that no other duty was imposed by the WMATA regulations. Similarly, the judge ruled that the jury had "only unguided speculation as a basis for concluding ... that the station manager could have safely interrupted the robbery on his own" by physical or verbal intervention. The judge therefore concluded that appellants had failed as a matter of law to prove proximate causation.

On appeal, appellants effectively concede that a call to the police could not have yielded a response in time to prevent or reduce Ms. Robinson's injuries. They argue, instead, that the station manager had discretion under WMATA's rules and standard procedures to take other measures such as commanding the assailant to stop or simply approaching the area of the assault in uniform (making "his uniformed presence ... known," in appellants' characterization). And they argue that the jury had sufficient facts on which to find that intervention of this sort would have cut short the assault and prevented Ms. Robinson's injuries.

We hold, with the trial judge, that the only duty owed by the station manager to Ms.

---

1. Mr. Robinson's injury consisted of loss of consortium.

Robinson was to notify immediately the transit police or similar officers, not to intervene physically or by words in the assault, and that as a matter of law the breach of that duty did not proximately cause Ms. Robinson's injuries. We therefore sustain the grant of judgment for WMATA without considering the alternative ground relied on by the judge.

## I.

The relevant facts are not disputed. WMATA concedes (as it did below) that the jury reasonably could have found that Ms. Robinson was assaulted for a period of up to two minutes in a Metrorail station; and that all or part of her struggle with the assailant as he sought to steal her purse and threw her to the ground was seen or at least heard by station manager Barlow (Ms. Robinson claimed she screamed throughout the struggle). The jury further could have found that Barlow did not summon the transit police or other authorities, or leave his kiosk during the assault. He was 62 years old at the time; according to both his and Ms. Robinson's testimony, the assailant appeared to be in his 20's. Barlow was trained in passenger safety but not law enforcement, negotiating with criminals or weapons use. He did not carry a weapon as part of his uniform as station manager.

Alan Brown, Assistant Superintendent of WMATA's Office of Rail Transportation, was responsible for training and supervision of Metrorail employees. He testified about the written Metrorail rules and standard operating procedures applicable to criminal acts of third persons. As Brown pointed out at trial, these rules prohibit "physical intervention" by a station manager to stop criminal behavior. And while they do not explicitly bar verbal intervention ("sounding some type of alarm or warning or making [the manager's] presence known" to the criminal), this action would be an improper response, he testified, because it could cause panic in the station and other unwanted consequences. Under WMATA's rules and procedures, ac-

cording to Brown, the proper response by a station manager witnessing a crime in progress is to notify the transit police or other authorities immediately.

## II.

WMATA's liability in tort for the acts of its agents is restricted to conduct that implements or carries out those "quasi-legislative policy decisions which are discretionary in nature" and for which WMATA is cloaked in immunity. *WMATA v. O'Neill,* 633 A.2d 834, 841 (D.C.1993) (quoting *McKethean v. WMATA,* 588 A.2d 708, 714 (D.C.1991)). The parties agree that here, as in *O'Neill,* the scope of WMATA's duty to a passenger [2] is defined by its written directives to its employees—"rules which define the appropriate standard of care in this situation." *Id.* at 838. In the present context of an assault upon a passenger by a third person, these rules mark the extent of WMATA's "duty to protect its passengers from foreseeable harm arising from criminal conduct of others." *Id.* at 840.

WMATA's written rules and standard procedures in question are contained in two documents, both introduced in evidence. Appellants argue that, Brown's testimony notwithstanding, the jury could reasonably interpret these rules and procedures as imposing on the station manager a duty to act more directly upon observing an assault than just by summoning the police, and that Barlow's failure to confront the assailant in any way was negligence that the jury reasonably could have found prolonged the assault and caused Ms. Robinson injury.

The principal document is WMATA's DE-PARTMENT OF RAIL SERVICES OPERATIONS MAN-UAL (SOP). Under the heading "Passenger Safety," it sets forth the responsibilities of station managers, general and specific. Among the general duties are frequent inspection of the station for unsafe conditions, warning passengers of unsafe conditions and practices, reporting dangerous conditions to the communications center, and the like.

---

**2.** WMATA has not contended that Ms. Robinson was not a Metro passenger to whom it owed a duty of care even though, according to the evi-

dence, she had not passed through the fare gate at the time of the assault.

SOP 1–4 through 1–11. The Manual states detailed procedures to be followed in two instances, the first when the station manager witnesses or learns of "accidents or incidents involving electrical shock or potentially hazardous conditions," the second "[u]pon witnessing or being informed of criminal acts" at the station. In the latter case (SOP 3–7), the station manager "shall" (as pertinent here):

> A. Notify TPAS [the transit police] immediately;

> \* \* \* \* \* \*

> D. Notify the Passenger Operations Supervisor via emergency call number "0" to report the incident and request ambulance service if necessary;

> \* \* \* \* \* \*

> F. *Avoid physical intervention of persons involved in criminal activities.*

(Emphasis added). The station manager's duty to report crime in progress is reinforced by WMATA's METRORAIL SAFETY RULES AND PROCEDURES HANDBOOK, applicable to all employees, which states:

> Rule 1.27 Employees shall immediately notify their supervisor, Transit Police, OCC [Office of Central Communications], or other appropriate persons when they are aware of unauthorized persons on WMATA property;

> Rule 1.28 Employees shall inform OCC or the Transit Police, whichever is quicker, when observing passengers committing disorderly, unsafe, or criminal acts. OCC or the Transit Police shall then take appropriate action.

■ If these were the sum total of the rules guiding the station master's response to observed criminal acts, appellants concede their case would fail on the first ground recited by the trial judge. But they point out that the Manual, under the heading "Emergency," also declares that "[t]he Station Manager's

> immediate and proper response to an emergency situation has priority over all other station operating duties. These [the SOP's] are only guidelines and may be adjusted or altered to fit the immediate

situation or as directed by supervisors or OCC. . . .

SOP 4–2. An "emergency is defined as any condition which . . . could cause, if allowed to persist, harm to passengers . . . ." SOP 4–3. Appellants point further to SOP 1–4 which states that station managers "shall be responsible for complying with the printed safety rules and procedures and the verbal instruction of Supervisors," but that "[i]n the absence of such, the Station Manager shall use his/her best judgment in determining the safest course of action to follow." Appellants say that the assault on Ms. Robinson fit the "emergency" condition defined above, so that the rule against physical intervention (SOP 3–7 F) should have yielded to the manager's duty to "adjust[ ]" his response "to fit the immediate situation," if only by asserting his "uniformed presence" or shouting to the assailant to stop. We do not think the rules and procedures entail that duty.

The Manual differentiates between accidents or incidents involving hazardous conditions and electrical shocks, on the one hand, and criminal acts on the other, describing in detail the response required of the station manager to each such event. The distinction between "hazardous conditions" and "criminal acts" is evident, and suggests that when the Manual goes on to allow the manager to "alter[ ]" his response in an emergency situation—defined as a "condition"—it is referring to the hazardous conditions covered in SOP 3–6. But even reading that provision more broadly, it does not expand the duties imposed on the station master by SOP 3–7 and the Handbook. Whereas SOP 3–7 employs the mandatory verb "shall" (the station master "shall . . . [a]void physical intervention"), SOP 4–2 states that in an emergency his response "may be adjusted to fit the immediate situation." It thus arguably permits the station manager to take steps besides summoning the police, but does not require him to do so. By committing this residual discretion to the station manager, WMATA, to that limited extent, allows him to weigh on the spot the same considerations as to an appropriate response to observed crime that underlie the directives. That is not the stuff of a duty for which WMATA is liable. *Cf. United States v. Gaubert,* 499 U.S. 315, 324,

111 S.Ct. 1267, 1274–75, 113 L.Ed.2d 335 (1991) ("[I]f a regulation allows the employee discretion, the existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which lead to the promulgation of the regulations."). In that sense this case is quite unlike *O'Neill, supra,* where the judgment left to the bus driver was as between specific responses (to unruly behavior by passengers) set forth in WMATA's safety rules. *See O'Neill,* 633 A.2d at 838–39.[3]

The "best judgment" authorization of SOP 1–4 likewise fails to help appellants' argument. That rule applies only "[i]n the absence of" printed safety rules and procedures governing the situation. SOP 3–7 F expressly bars physical intervention, and both SOP 3–7 and the Handbook define the manager's duty when observing "criminal acts" as immediate notification. It is the OCC or the transit police which "shall then take appropriate action" in response to that behavior. HANDBOOK, Rule 1.28. And while the Manual does not expressly preclude verbal intervention such as (in appellants' words) "sounding a warning ... vocally and/or over the intercom or loudspeaker," the testimony was unrebutted that WMATA considers this an improper response because, as Superintendent Brown testified, it can cause panic among passengers and other unwanted results.

Finally, it would make no sense for WMATA to encourage or permit station managers to assume the role of police in the manner appellants suggest. The Manual as well as the testimony of Brown and Barlow describe the duties for which the station manager is trained. Barlow's job was to monitor the condition and operation of the fare machines, fare gates, escalators, elevators and platforms and to give directions and fare and train information to passengers. On the early morning shift such as when the assault

occurred, his job would have been to open the station, inspect its condition, consult various logs from the previous shift and report the station's condition to the Office of Central Communications. Station managers are not trained in law enforcement or negotiating with criminals, are given no physical training in self-defense, and are not armed; their uniform does not resemble a police officer's uniform. There are no age limitations on their job; Barlow was 62 years old at the time of the assault. A show of "presence" of the sort appellants say the jury fairly could have required would risk a confrontation for which station managers are not trained or equipped.

▬ In sum, the duty Barlow owed Ms. Robinson was neither more nor less than prompt notification of the police as called for by WMATA's procedures. The remaining question, therefore, is whether the jury rationally could find that his neglect of that duty had "a substantial and direct causal link to [Ms. Robinson's] injury." *District of Columbia v. Freeman,* 477 A.2d 713, 716 (D.C. 1984). While "[n]ormally, the existence of proximate cause is a question of fact for the jury," *id.,* the jury's resolution of that issue may not "rest[ ] upon surmise." *Twyman v. Johnson,* 655 A.2d 850, 854 (D.C.1995); *see also Freeman,* 477 A.2d at 716 (jury's conclusion of proximate cause must be a "rational finding" based on evidence adduced at trial). Appellants offered no evidence at trial that the transit police (or other law enforcement officers) could have arrived at the scene in time to interrupt an assault that lasted at most two minutes. The only evidence on the point is that when Barlow did call the OCC to request police aid after the assault, transit police arrived within five to ten minutes. There was thus no evidence allowing the jury to infer that a timely call would have brought them to the scene in time to stop the assault before it caused Ms. Robinson injury. In-

---

**3.** To reiterate, however, the station manager has an unmistakable duty to notify the police; the residual discretion arguably given him by SOP 4–2 to take additional steps upon witnessing a

crime does not relieve him of that primary duty. Hence the failure to take such additional steps obviously does not mean there is no duty at all for which WMATA is liable.

deed, appellants do not argue the contrary on appeal.[4]

*Affirmed.*

REID, Associate Judge, concurring:

I concur in the result reached in this case. Under either a "narrow" or "broader" duty of care owed to Ms. Robinson by WMATA, the breach of that duty was not the proximate cause of her injuries. In short, her injuries arising from criminal conduct were not foreseeable, even assuming a broader duty of care than simply notifying the police that criminal activity is in progress.

I disagree with my colleagues' holding regarding the duty WMATA owed to Ms. Robinson. Notwithstanding footnote 3 of the opinion, they conclude that "the duty owed to Ms. Robinson was neither more nor less than prompt notification of the police as called for by WMATA's procedures." To reach this conclusion, they give what I believe to be a strained reading to SOP 3.6, 3.7 and 4 (4.2–4.5), as contained in WMATA's DEPARTMENT OF RAIL SERVICES OPERATIONS MANUAL (SOP). The topic heading covering both SOP 3.6 and 3.7 is "Reports of Electrical Shock, Hazardous Conditions Or Criminal Acts." A separate section, SOP 4 (4.2–4.5) is headed "Emergency," without any qualification. My colleagues read "criminal acts" out of the "emergency" section. I see no basis for such a reading. WMATA has not so interpreted its own regulations in any formal issuance.[1] Had WMATA intended to exclude criminal acts from any definition of emergency, logically it would either have incorporated the emergency section into SOP 3.6, or would have cross-referenced SOP 3.6 in SOP 4 (4.2–4.5). It did neither. I would prefer to await WMATA's interpretation of its own regulations, rather than to give them a strained reading which is unnecessary to the resolution of this case.

Furthermore, in their interpretation of WMATA's regulations, my colleagues skirt what I believe to be a rather complex issue

as to whether SOP 4.2 relating to a station manager's responsibility, and involving some exercise of discretion, may contain a duty which could result in WMATA's liability. In glossing over the "strong presumption" language in *United States v. Gaubert,* 499 U.S. 315, 324, 111 S.Ct. 1267, 1274–75, 113 L.Ed.2d 335 (1991), the majority fails to take stock of other language which reveals the complexity of the duty of care issue as it concerns WMATA. The Supreme Court stated in *Gaubert:*

> The requirement of judgment or choice is not satisfied if a "federal statute, regulation or policy specifically prescribes a course of action for an employee to follow," because "the employee has no rightful option but to adhere to the directive." *Berkovitz, et al. v. United States,* 486 U.S. 531, 536 [108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531] (1988).

> Furthermore, even "assuming the challenged conduct involves an element of judgment," it remains to be decided "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Ibid.*

*Gaubert,* 499 U.S. at 322–23, 111 S.Ct. at 1273; *see also* Scalia, J. concurring in part and concurring in the judgment, *id.* at 334–36, 111 S.Ct. at 1279–81.

In my view, one should not assume (as I believe one could after reading my colleagues' opinion) that the exercise of employee discretion, by any WMATA employee, automatically will lead to a finding of "no duty for which WMATA is liable." However, I concur in the result reached in this case since there was no evidence introduced to show that the criminal act against Ms. Robinson was so foreseeable that a duty arose to guard

---

4. *O'Neill, supra,* differs critically from this case on that ground as well. In sustaining the jury's finding of proximate causation there, we stressed the time—ten minutes—available to the WMATA bus driver in which to take any of several measures he was expressly instructed to take by WMATA's safety directives when confronted with an unruly passenger. 633 A.2d at 840–41.

1. Indeed, when Hugo Barlow, the station manager of the Deanwood Metro station at the time Ms. Robinson was injured, was asked at trial about the emergency regulations, he did not discount them on the ground that they were inapplicable to criminal acts, and WMATA's attorney did not raise any relevancy objection. Mr. Barlow testified that he had attended classes regarding responsibilities to passengers.

against it. *Cook v. Safeway Stores, Inc.*, 354 A.2d 507, 509–10 (D.C.1976).