**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,**
Appellant,

v.

**Mark G. YOUNG, Appellee.**

No. 97–CV–1050.

District of Columbia Court of Appeals.

Argued Oct. 28, 1998.
Decided June 24, 1999.

Nancy F. Langworthy, with whom Robert L. Polk and Robert J. Kniaz, Washington, DC, were on the brief, for appellant.

Michael H. Gottesman, with whom Robert F. Muse and Christopher H. Mitchell, Washington, DC, were on the brief, for appellee.

Before TERRY and FARRELL, Associate Judges, and GREENE, Associate Judge of the Superior Court of the District of Columbia.*

TERRY, Associate Judge:

This case involves a collision between a bus and a bicycle in a District of Columbia intersection. The two impacted when the bus driver, while making a right turn, cut off the bicyclist, who was in the lane to the right of the bus. The bicyclist struck the side of the bus, lost his balance, and fell under the bus. The bus' momentum carried it forward, trapping the bicyclist under its right rear wheel. The jury returned a verdict for the bicyclist, awarding him $925,000 in damages. Through the use of a special verdict form, the jury found that the bus driver was negligent and that the bicyclist was contributorily negligent. However, because the jury concluded that the bus driver had the last clear chance to avoid the accident, it found the driver ultimately responsible for what happened.

Appellant, the Washington Metropolitan Area Transit Authority ("WMATA" or "Metro"), maintains that the trial court erred in denying its motion for judgment notwithstanding the verdict. It argues that appellee Young, the bicyclist and plaintiff below, did not present sufficient evidence of last clear chance, and hence that the case should not have gone to the jury on that theory. WMATA also asserts that the court erred when it defined the word "concur," in reinstructing the jury on concurrent negligence, and when it allowed the jury to consider WMATA's standard operating procedures as evidence of the relevant standard of care. Although the question is a close one, we hold that appellee presented sufficient evidence to go to the jury on the issue of last clear chance. Finding WMATA's other arguments unpersuasive, we affirm.

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (1995).

**I**

The accident occurred at the intersection where Calvert Street and Cleveland Avenue meet 29th Street, N.W. Like many in the District of Columbia, the intersection has an unusual configuration. Motorists entering the intersection from the east on Calvert Street are presented with four options: a sharp right turn onto 29th Street heading north, a moderate right onto Cleveland Avenue heading northwest, a moderate left onto 29th Street heading southwest, and a sharp left onto McGill Terrace heading south. Because Calvert Street ends at the intersection, motorists cannot continue straight ahead on Calvert. The westbound portion of Calvert Street, upon which both the bus and the bicycle were proceeding just before the accident, consists of two lanes. By means of a channeling line painted in the roadway, traffic in the left lane is directed to make a wide-angle right turn (about 135 degrees) onto Cleveland Avenue unless turning left. Traffic in the right lane can make either a wide-angle right turn onto Cleveland or a sharp right turn (90 degrees) onto 29th Street.

Mr. Young testified that on September 9, 1994, at approximately 9:20 a.m., he was traveling westbound on Calvert Street, approaching its intersection with Cleveland Avenue and 29th Street. He had ridden through that intersection on his bicycle many times on his way to and from work and intended as usual to proceed through the intersection and head northwest on Cleveland. When he was approximately four hundred feet away, he noticed a Metro bus ahead of him at the intersection. The bus was in the left lane and was stopped at a red light.

Mr. Young rode his bicycle toward the intersection in the right lane, which was clear of traffic. As he neared the intersection, the light turned green. The bus accelerated quickly, and Young continued pedaling at a steady rate, anticipating the upcoming hill on Cleveland Avenue. As they entered the intersection, the bus was slightly ahead and to the left of Young. Once in the intersection, the bus began to bear slightly to the right, indicating to Mr. Young that it was continuing forward onto Cleveland Avenue. The bus then made a sudden sharp right turn into the northbound lane of 29th Street, cutting across Young's path in the curb lane. Young tried to avoid the bus by braking and turning to the right, but he was unable to elude its continuing encroachment, and his bicycle struck the middle of the right side of the bus. The initial contact caused him to lose his balance and collide with the bus a second time. He was then propelled over the handlebars and landed under the bus, where he was dragged for a short distance. When the bus came to a stop, its right rear wheel was on top of his left leg, pinning him there until, nearly an hour later, rescue workers raised the bus and pulled him out. Mr. Young suffered a number of severe injuries as a result of this accident.

According to Young, the bus gave no indication that it was about to make a right turn into 29th Street before it abruptly veered in front of him. The bus did not appear to be braking or altering its speed, nor did it stop to indicate that it was going to cut across the curb lane. At trial Young could not recall whether the bus' right turn signal was flashing. However, he testified that because the bus was in the left lane, a flashing right signal would have indicated to him that the bus was making a moderate right turn onto Cleveland Avenue rather than a sharp right onto 29th Street.

Colleen Morgan corroborated much of Young's account of the accident. Ms. Morgan was driving south on 29th Street, looking for a parking space, when she saw the bus and the bicycle enter the intersection, advancing toward Cleveland Avenue. At that time they were about four or five feet apart. "The bus was more in toward the left lane, and the cyclist was more in the right lane." The bus then "took a sharp turn and impacted the cyclist . . . ." Ms.

Morgan further testified that the bus made a wide right turn, going first "a little left, but then [taking] a real sharp abrupt turn to the right." She also observed that buses often make wide right turns at that intersection. According to Morgan, the bicyclist struck the side of the bus near its front end. After the impact, the bus continued forward for a short distance and then stopped, facing her on 29th Street. In Ms. Morgan's opinion, Mr. Young could not have done anything to avoid the collision, but the bus could have stopped if the driver had seen Young before he began to make the turn.

Stanhope Charles, a passenger on the bus who was seated three seats behind the driver, also recalled that the bus was "in the passing lane" when it stopped for the red light at the intersection. When the bus had passed the bicyclist earlier on Calvert Street, Charles had noticed that the bicyclist was "in the curb lane" and was not racing or behaving recklessly. Charles did not see the collision between Young and the bus, but he recalled that the driver stopped the bus immediately when another passenger yelled, "Someone's hit." Moreover, although Charles described the bus' turn as "wide," he also said that the driver was operating the bus in a reasonable manner and made "a fluid turn."

Some of WMATA's standard operating procedures (SOPs) were introduced into evidence and were the subject of testimony by Napoleon Jones, a WMATA training and safety instructor. The SOP for right turns states that bus drivers should maintain a speed between three and five miles per hour during the turn, keep one foot on the brake if they are going over three miles per hour, and check mirrors for vehicles and pedestrians during the turn. Mr. Jones said, however, that the SOPs set "an ideal standard as a goal"; drivers are not disciplined for making right turns that do not strictly comply with the SOPs. Jones

confirmed that it would be improper to make a right turn onto 29th Street from the left lane of Calvert Street. However, he explained that it may not be possible to remain completely in the right lane while making such a right turn; a driver may have to angle left before beginning the turn to the right. In addition, when making a turn on an incline,[1] it may not be possible to stay at three miles an hour or to keep one's foot on the brake.

With respect to the SOP for mirror adjustments, Mr. Jones testified that if the mirrors are properly adjusted in accordance with the SOP, a driver can see the right rear tire of the bus through the right exterior mirror but cannot see vehicles behind the bus through that mirror. The language of the SOP and the diagrams that accompanied it were somewhat inconsistent with Jones' testimony. According to the diagram for the right exterior mirror, a driver should be able to see objects and vehicles that are located near—i.e., four to five feet from—the rear of the bus through that mirror. Jones' testimony that the right exterior mirror should be positioned so that the driver can see the right rear tire conforms to the SOP. However, under the SOP, the driver needs to see the tire only in the lower left corner of the mirror; the tire is not the only thing that can be seen in the mirror.

In contrast to Mr. Young's testimony, Willie Lewis, the bus driver, stated that he was in the right-hand lane on Calvert Street when he stopped at the red light. He also said that he activated his turn signal as he approached the intersection and that the signal was blinking the entire time he was stopped there. Lewis' bus was behind a tour bus and in front of a truck. While stopped at the light, Mr. Lewis saw the truck in his mirrors, but he did not see a bicycle. When the light turned green, he proceeded forward and checked his mirrors before beginning his

1. Calvert Street is essentially level, but both 29th Street and Cleveland Avenue proceed uphill from the intersection.

right turn. As he started to turn, he angled the bus out to the left so that he could make the sharp right onto 29th Street. While he was angling out and "going into" his turn, he noticed "someone on a bike in the interior mirror." By his estimation, the bicycle was "more than forty feet" from the intersection and was on the sidewalk. When he did not see the bicyclist in the right exterior mirror of the bus, he continued with the turn,[2] proceeding at approximately five miles per hour.[3] After he completed the turn, he "felt a bump, bump, and someone yelled out, and [he] immediately stopped the bus."

Two other witnesses, Herman Adkins and Paul Jordan, corroborated Mr. Lewis' testimony that the bus was in the right lane at the intersection. Both also recalled that Mr. Young's bicycle hit the rear portion of the bus and that the bus had completed at least half the turn when the impact occurred. Jordan was mowing grass in front of the Oyster Elementary School, at the northeast corner of 29th and Calvert, when he saw the accident. He remarked that the speed of the bus was not unusual for buses at that intersection.[4] Adkins, the driver of the truck that was directly behind the bus, estimated the bus' speed to be five or six miles per hour and the bicycle's speed at fifteen to twenty miles per hour.

Mr. Adkins had seen the bicyclist on the street before he stopped his truck for the red light at 29th and Calvert. As he began to move his truck into the left lane to continue up Cleveland Avenue, he checked his mirror for the bicyclist. When he saw the bicyclist in the mirror, Adkins stopped his movement to the left so that the rear of the truck would not clip him when it swung out during the turn. The bicyclist "flew around" him and continued forward without slowing down. Adkins recalled that by the time the bicyclist reached the intersection, the bus was already in the intersection and turning. He watched as the bicycle struck the bus twice and Mr. Young flipped over the handlebars, falling under the bus. He concluded that there was nothing the bus driver could have done to avoid the accident, but believed that the bicyclist could have slowed down or even jumped the curb.[5]

From the final position of the bus and its turning radius, WMATA's accident reconstruction expert, Charles Simpson, concluded that the bus was in the right lane when it began its turn. However, on cross-examination, Mr. Simpson conceded that the bus need not have started in the right lane to end up where it did.[6] Simpson also testified that in the course of ten hours of investigation at the intersection, he did not see any vehicles use their right turn signals when proceeding through the intersection from Calvert Street onto Cleveland Avenue. He admitted, in addition, that if a vehicle in the left lane on Calvert Street had its right turn signal flashing, the signal could indicate that it was going toward Cleveland Ave-

---

2. Despite Jones' testimony that bus drivers cannot see traffic approaching from behind in the right mirror, Lewis testified that he relied on that mirror to determine whether the bicyclist was behind the bus.

3. The speed limit in the area is twenty-five miles per hour.

4. On cross-examination by Young's counsel, Mr. Jordan acknowledged that it was the sound of the collision that drew his attention to the bus and the bicycle, thereby indicating that he was not watching the intersection before the impact occurred.

5. Adkins was impeached with prior statements to an investigator that he was in the left lane directly behind the bus. The investigator also testified that Adkins had told her he was not sure whether he was in the right or left lane or straddling the two. She said, in addition, that Adkins had expressed to her his belief that the bus driver had "messed up."

6. Cross-examination and rebuttal also revealed that Simpson had conducted his analysis under the assumption that the bus came to rest in the wrong place, i.e., not where pictures of the accident scene showed that it came to rest. This testimony significantly undermined his conclusions.

nue. Moreover, Bruce Wakefield, an expert called by Mr. Young, testified that during his own investigation he saw "several" Metro buses using their right turn signals when continuing from the left lane of Calvert Street onto Cleveland Avenue.

## II

### A. The General Rule and the Limited Exception

██ In the District of Columbia, a plaintiff in a negligence action generally cannot recover when he is found contributorily negligent. *E.g., Felton v. Wagner,* 512 A.2d 291, 296 (D.C.1986) ("contributory negligence is an absolute bar to recovery in a negligence action"); *Sinai v. Polinger Co.,* 498 A.2d 520, 528 (D.C.1985) ("the plaintiff is barred from recovery if his negligence was a substantial factor in causing his injury, even if the defendant was also negligent, as long as the plaintiff's negligence contributed in some degree to his injury" (internal punctuation omitted)). Thus, on facts very similar to those in the case at bar, this court denied recovery to a bicyclist who collided with a truck when the truck made a right turn in front of him. In *Washington v. A & H Garcias Trash Hauling Co.,* 584 A.2d 544 (D.C. 1990), a jury returned a verdict for the plaintiff bicyclist, but the trial court granted the truck owner's motion for a new trial, and at the second trial the court directed a verdict for the defendant at the close of the plaintiff's case. We affirmed that ruling. As in the instant case, the bicyclist in *Washington* was riding in the curb lane, to the right of a large trash truck, when the truck suddenly turned right in front of him. Although it was not clear from the testimony whether the truck driver could see the bicyclist in his mirror before starting to turn, the bicyclist admitted that he was "not paying any attention" to the truck's flashing right turn signal "because he 'didn't figure he was going to make that turn.'" *Id.* at 546. We concluded:

The bicyclist's own testimony established that ... [he] was aware of the truck. Even though he was not paying attention to the turn signal, he was fully chargeable with the knowledge that when the truck reached M Street on a green light and proceeded into the intersection, it would either go straight ahead or turn onto M Street. The bicyclist, for his own safety, was obliged to pay close attention to the movements of the truck, and to anticipate the possibility that it might turn right, toward the bicycle.... [H]e knew that a right turn was one of three possible directions the truck might take upon reaching the intersection.

*Id.* (footnote omitted). On these facts we held, as the trial court had held, that the bicyclist "was contributorily negligent as a matter of law." *Id.* at 545. *Washington* strongly suggests that Mr. Young also was contributorily negligent as a matter of law, and that he is therefore not entitled to recover any damages at all from WMATA.

██ But there is a narrow exception to the rule barring recovery when there is contributory negligence—an exception not raised by the parties and not addressed by the court in *Washington.* Under the doctrine of last clear chance, a plaintiff may recover, despite his own contributory negligence, if he can demonstrate that "the defendant had a superior opportunity to avoid the accident." *Phillips v. D.C. Transit System, Inc.,* 198 A.2d 740, 741–742 (D.C.1964). The doctrine "presupposes a perilous situation caused by the negligence of both the plaintiff and the defendant; it assumes that after the situation had been created there was a time when the defendant could, and the plaintiff could not, avoid the accident." *Griffin v. Anderson,* 148 A.2d 713, 714 (D.C.1959). To recover under the last clear chance doctrine, therefore, the plaintiff must prove by a preponderance of the evidence:

(1) that the plaintiff was in a position of danger caused by the negligence of both plaintiff and defendant; (2) that the plaintiff was oblivious to the danger, or

unable to extricate [himself] from the position of danger; (3) that the defendant was aware, or by the exercise of reasonable care should have been aware, of the plaintiff's danger and of [his] oblivion to it or [his] inability to extricate [himself] from it; and (4) that the defendant, with means available to him, could have avoided injuring the plaintiff after becoming aware of the danger and the plaintiff's inability to extricate [himself] from it, but failed to do so.

*Felton,* 512 A.2d at 296 (citations omitted); accord, *Washington Metropolitan Area Transit Authority v. Johnson,* 726 A.2d 172, 174 (D.C.1999) (en banc) (quoting *Felton* ); *District of Columbia v. Huysman,* 650 A.2d 1323, 1326 (D.C.1994) (same); *Robinson v. District of Columbia,* 580 A.2d 1255, 1258 (D.C.1990) (same); *Washington Metropolitan Area Transit Authority v. Jones,* 443 A.2d 45, 51 (D.C.1982) (en banc) (listing factors); *Byrd v. Hawkins,* 404 A.2d 941, 942 (D.C.1979) (same).

### B. *Last Clear Chance and the Facts of This Case*

 The outcome of this appeal depends on whether Mr. Young adequately proved the second, third, and fourth elements of last clear chance as outlined in *Felton.*[7] Therefore, it is important to emphasize that the second element may be proved in either of two ways. The plaintiff needs to show *either* that he was oblivious to the danger *or* that he was unable to extricate himself from his position of peril, but not both. Equally important is the objective standard inherent in the third element. The defendant need not have *actually* known of the plaintiff's danger and his obliviousness to it or inability to extricate himself from it, provided that the defendant should *reasonably* have been aware of those facts. This court has also clarified that the same is true of the fourth element, which "pertains to a defendant who, with means available to him, could

have avoided injuring the plaintiff after he became aware of, or reasonably should have become aware of, the danger and the plaintiff's inability to extricate himself from it." *Robinson,* 580 A.2d at 1258; accord, *Huysman,* 650 A.2d at 1326.

 In asserting that the trial court erred in denying its motion for judgment notwithstanding the verdict, WMATA contends that Mr. Young did not adequately prove any of the last three elements of last clear chance. We agree that the evidence did not compel a verdict in Mr. Young's favor, nor does he contend otherwise. Our review of the denial of a motion for judgment n.o.v., however, is limited. "This court will only reverse a denial of a motion for judgment notwithstanding the verdict if 'no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party.'" *Huysman,* 650 A.2d at 1326 (citation omitted). Applying this standard to the present case, we hold that although the issue is very close, the evidence was sufficient to support the jury's finding that the bus driver had the last clear chance to avoid the accident.

Before addressing the substance of appellant's argument, we must point out that the elements of last clear chance build on one another: the second depends on proof of the first, the third on the second, and so on. Thus, although the first element is not at issue in this appeal, we begin our analysis there to determine when Mr. Young arrived at a position of peril. The evidence showed that Young reached that point when he negligently rode up alongside a bus that was going to make an improper right turn from the left lane. Prior to that moment, the possibility of danger existed, but there was still an opportunity for Young to avoid it. Once he arrived at the side of the bus, however, he was in a dangerous position.

7. Contrary to WMATA's belief, whether "the defendant had a superior opportunity to avoid the accident," *Phillips,* 198 A.2d at 741–742, is not a fifth element of last clear chance, but simply a shorthand way of stating the fourth element.

Turning to the second element, we are reluctant to suggest that Young was oblivious to the danger posed by the bus. Although Young testified that the bus made no indication that it was going to turn right before it suddenly crossed his path, he had seen the bus long before he rode up beside it. The specific danger posed by the bus was not obvious until it abruptly turned right, but any vehicle as big as a bus poses a threat to smaller vehicles, especially bicycles. That is why we held in *Washington v. A & H Garcias Trash Hauling Co.*, *supra*, that "[t]he bicyclist, for his own safety, was obliged to pay close attention to the movements of the truck, and to anticipate the possibility that it might turn right, toward the bicycle." .584 A.2d at 546.

But the evidence, particularly Mr. Young's own testimony, would permit a reasonable jury to find that he was in an inextricable position of peril when he rode up alongside the bus. Young stated that when the bus suddenly turned in front of him, he tried to avoid running into it by braking and turning to the right. That attempt, as it turned out, was unsuccessful. In addition, from her vantage point just a few feet away, Colleen Morgan concluded that Young could not have done anything to avoid the accident. Young's inextricability from his position of peril is further evidenced by the accident itself. While such an inference may not always be possible, one can reasonably infer from the circumstances presented here that if Young had been able to avoid the accident, he would have done so. The jury was not obliged to accept Herman Adkins' assertion that Young had means available to avoid colliding with the bus.

■ We are not persuaded by WMATA's argument that Young was required to present expert testimony to prove his inextricability from the position of peril. In

*Felton* we held that the plaintiff's testimony that she "froze in place" when she saw the defendant's car bearing down on her satisfied the second element of last clear chance. 512 A.2d at 297. Furthermore, the issue of whether Young was able to avoid colliding with the bus was not "so distinctly related to some science, profession, or occupation as to be beyond the ken of the average lay person." *District of Columbia v. Peters*, 527 A.2d 1269, 1273 (D.C.1987) (citations omitted). The average lay person has sufficient experience with vehicles, including bicycles, to understand how they and their operators react to various situations. We see no need to require an expert to explain Young's behavior in terms of rates of acceleration and braking. While such information may be useful and even critical in some cases,[8] it was not needed here. Avoiding the accident came down to splitsecond reactions which the jury was capable of assessing without the aid of an expert. We hold that although Mr. Young's evidence was not strong, it was sufficient to support an inference that he was unable to extricate himself from his position of peril, and hence sufficient to prove the second element of last clear chance.

Whether there was sufficient evidence of the third element is an equally close question. Nevertheless, viewing the evidence in the light most favorable to Mr. Young, we conclude that a reasonable jury could find that the bus driver knew or should have known that Young was in a position of peril and was unable to extricate himself from that position. The diagrams contained in WMATA's SOP for the positioning of mirrors on a bus indicate that the right exterior mirror should be positioned so that the driver can see objects that are near the rear of the bus. Accepting Colleen Morgan's testimony that Young was four to five feet from the rear of the bus and on the right side of the bus when he

---

**8.** *See, e.g., Washington Metropolitan Area Transit Authority v. Davis*, 606 A.2d 165 (D.C. 1992) (expert testimony established that a bus could not have avoided the collision unless it had been going five to ten miles per hour, well below the posted speed limit, and thus the fact that the bus was speeding was not the controlling factor).

entered the intersection, the jury could find that the driver saw or (more likely) reasonably should have seen Young in the right exterior mirror if it were properly positioned. From such a finding, the jury could also conclude that the bus driver should have been aware of Young's peril.

Furthermore, even if the mirror did not provide a view of Young as he rode up next to the bus, the driver testified that he saw Young in his interior mirror just as he was "going into" his turn. Although he also said that he thought Young was on the sidewalk and hence out of harm's way, a trier of fact could reasonably conclude that the driver should have checked his mirrors again and, if no view of what was behind the bus was available, taken other precautions to ensure that the bicycle was not in a dangerous position. WMATA's SOP for right turns instructs a bus driver to "[u]se [the] right side view and [the] inside mirror to determine that [the] right side of [the] bus will clear the corner curb and vehicles or pedestrians. If unsure of clearance, stop the bus and check."

WMATA's reliance on *Felton* in this situation is misplaced. The defendant in *Felton* drove across a double yellow line to go around a delivery truck that was blocking traffic and struck the plaintiff, who was jaywalking across a busy downtown street in the middle of the block. As he came around the truck, the defendant saw the plaintiff, who was at most a few car lengths away, but was unable to stop before hitting her. We held that there was no evidence that the defendant was aware or could have been aware of the plaintiff's perilous situation in time to avoid the accident. 512 A.2d at 297. By contrast, the evidence in this case indicates that the bus driver saw or reasonably should have seen Mr. Young on his bicycle before he made the turn—and therefore in time to avoid the accident.

Having thus concluded that Mr. Young sufficiently proved the third element of last clear chance, we turn to the fourth element and conclude that, because the driver reasonably should have seen Young before initiating the right turn, he could have avoided the accident by stopping or otherwise aborting the turn. Colleen Morgan specifically testified that, as the situation appeared to her, the bus could have avoided the accident by stopping if the driver had seen Mr. Young. WMATA's claim that the driver would have had to act "instantaneously" to avoid the accident, *see Huysman*, 650 A.2d at 1326; *Phillips*, 198 A.2d at 742, is unpersuasive because it assumes that the driver was under no duty to act until after he began the turn. The jury could reasonably find, however, that the driver could and should have avoided the accident by stopping *before* he began his turn. Moreover, WMATA's SOP instructs drivers to ensure that the right side of the bus is clear before attempting a right turn. The jury could have found that, had the driver followed the SOP, he would have seen Mr. Young riding his bicycle to the right of the bus and would have been able to avoid the accident by simply not turning.

### III

WMATA also contends that the trial court's definition of the word "concur," in reinstructing the jury on concurrent negligence, was confusing and substantially erroneous. However, as we said in *District of Columbia v. Robinson*, 644 A.2d 1004, 1005 (D.C.1994), the "principle of 'concurrent negligence' finds no apparent reflection in the elements of the last clear chance doctrine as formulated in this court's decisions." And even assuming that WMATA was entitled to a concurrent negligence instruction in the first place (Young argues vigorously that it was not), WMATA has failed to show any prejudice resulting from the instruction as given, and none is apparent from the record. *See id.* at 1007–1008. The arguably incorrect language of which WMATA complains was accompanied by a concededly correct definition equating "concur" with "act together." We find no reversible error.

## IV

Finally, WMATA argues that the trial court erred when it permitted the jury to consider its SOP for right turns. It contends that the introduction of the SOP imposed upon it a duty of extraordinary care because it denotes the ideal right turn, not a required right turn, and that aspects of the SOP were impossible to follow at 29th and Calvert Streets. In addition, WMATA contends that the SOP was irrelevant because' it was designed to enhance the safety of passengers and to prevent damage to buses, not to establish a standard of care or a duty to other motorists or non-passengers such as Mr. Young.

In *Garrison v. D.C. Transit System, Inc.*, 196 A.2d 924 (D.C.1964), this court held that company rules and regulations contained in a drivers' instruction manual were admissible as evidence from which a jury could infer a particular driver's negligence if he failed to comply with those regulations. The plaintiff, a passenger on a bus, was injured when the driver made a sudden stop. We upheld the admission of bus company regulations setting forth the correct procedures for using the brakes on the bus. Although company rules are not "conclusive" or "wholly definitive" and their violation does not constitute negligence *per se*, we held that they " 'constitute[ ] some indication of the care required under the circumstances, and may properly be considered by the jury in determining the question of negligence vel non.' " *Id.* at 925 (quoting C.R. McCorkle, Annotation, *Admissibility in Evidence of Rules of Defendant in Action for Negligence*, 50 A.L.R.2D 16, 21 (1956)); *see also Washington Metropolitan Area Transit Authority v. O'Neill*, 633 A.2d 834, 841 (D.C. 1993).

 In the present case, WMATA's SOP regarding the proper method of making a right turn was admissible. While not conclusive of the question, the SOP was, here as in *Garrison*, some evidence of the degree of care required under the circumstances. The SOP instructs drivers to "[u]se [the] right side view and [the] inside mirror to determine that [the] right side of [the] bus will clear the corner curb *and vehicles or pedestrians* " (emphasis added). Thus the very language of the SOP indicates that it is intended to protect the safety of pedestrians and other vehicles (including bicycles), not just passengers. Moreover, WMATA was able to explain to the jury, through the testimony of Mr. Jones, that the SOP described the perfect turn, but that such a turn was not possible at the intersection where the accident occurred, and that drivers are not reprimanded for making turns not in conformity with the SOP. This testimony dispelled any conceivable prejudice.

## V

Our holding today is a narrow one, dependent on the particular facts of this case, and should not be read as a retreat from anything we said in *Washington v. A. & H Garcias Trash Hauling Co.* In *Washington* we held, on facts very similar to those presented here, that the plaintiff bicyclist was contributorily negligent as a matter of law. Nevertheless, in the instant case we are persuaded that, although the evidence was far from overwhelming, Mr. Young did present sufficient evidence of last clear chance to justify the jury's verdict in his favor. In the absence of other errors, we must uphold the jury's decision. Accordingly, the judgment is

*Affirmed.*