# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 22, 2007         Decided March 27, 2007

No. 06-7037

JUDITH C. BRIGGS, PERSONAL REPRESENTATIVE
FOR THE ESTATE OF GREGORY DERRINGER, DECEASED,
APPELLANT

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,
ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 01cv01876)

*Calvin Steinmetz* argued the cause for appellant. With him
on the briefs was *Thomas Lester*.

*John J. Hathway* and *Andrew J. Marcus* argued the cause
for appellees Washington Metropolitan Area Transit Authority,
et al. With them on the brief were *Michael C. Gartner*, *Keith M.
Bonner*, and *Andrew Butz*.

*James C. McKay, Jr.*, Senior Assistant Attorney General,
Office of the Attorney General for the District of Columbia,
argued the cause for appellee District of Columbia. With him on
the brief were *Robert J. Spagnoletti*, Attorney General at the

time the brief was filed, *Todd S. Kim*, Solicitor General, and *Edward E. Schwab*, Deputy Attorney General.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

EDWARDS, *Senior Circuit Judge*: Judith C. Briggs filed a wrongful death and survival action seeking to recover damages from the Washington Metropolitan Area Transit Authority ("WMATA" or "Metro"), the District of Columbia ("District"), the Washington Convention Center Authority ("Authority"), Clark Construction Company ("Clark"), and Sherman R. Smoot Company ("Smoot") after an unknown assailant murdered her son near the top of the escalators at a Metro station in Washington, D.C. Under D.C. law, a plaintiff alleging negligence "'has the burden of proving . . . the applicable standard of care, a deviation from that standard by the defendant, and a causal relationship between the deviation and the . . . injury.'" *Varner v. District of Columbia*, 891 A.2d 260, 265 (D.C. 2006) (quoting *District of Columbia v. Wilson*, 721 A.2d 591, 597 (D.C. 1998)); *accord Butera v. District of Columbia*, 235 F.3d 637, 659 (D.C. Cir. 2001). "Where an injury is caused by the intervening criminal act of a third party, . . . liability depends upon a more heightened showing of foreseeability than would be required if the act were merely negligent." *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 641 (D.C. 2005) (en banc) (internal quotation marks omitted).

Before the District Court, appellees moved for summary judgment on the grounds that Briggs had both failed to establish foreseeability and demonstrate an applicable standard of care. The District Court granted appellees' motion, holding that Briggs had not satisfied the requirement of a heightened showing of foreseeability. *Briggs v. WMATA*, Civ. No. 01-1876 (D.D.C. Mar. 6, 2006), *reprinted in* Joint Appendix ("J.A.") 627-38. On appeal, Briggs argues that summary judgment for

appellees was unwarranted, because she made out a prima facie case of negligence that was more than enough to get the case before a jury. We disagree. We need not decide whether Briggs failed to establish foreseeability. Rather, we hold that appellees are entitled to summary judgment because Briggs did not offer creditable evidence sufficient to establish a controlling standard of care. Under D.C. law, this shortcoming is "fatal to a negligence claim." *Scott v. District of Columbia*, 101 F.3d 748, 757 (D.C. Cir. 1996). Accordingly, we affirm the grant of summary judgment.

## I. BACKGROUND

After determining that a new convention center "would have a significant economic impact, directly and indirectly, on the District," the D.C. Council established the Authority and charged it with "acquir[ing], construct[ing], equip[ping], maintain[ing], and operat[ing] the new convention center." D.C. CODE §§ 10-1201.01, 10-1202.02 (2001). The Authority contracted for construction management services with a joint venture formed by Clark and Smoot. Because construction of the convention center required improvements and modifications to the Mount Vernon Square-UDC Metro Station, the Authority also entered into an agreement with WMATA.

During construction, pedestrians could only access the Mount Vernon Square Metro station through a walkway separated from the street by chain link fencing. In order to protect people from construction debris, sheets of plywood nearly two stories high enclosed the portion of the passageway closest to the station's escalators. The body of Dr. Gregory Derringer was found at approximately 1:00 a.m. on August 20, 2000, inside this plywood enclosure near the top of the escalators at the station. It was determined that Dr. Derringer had been murdered by a single stab wound to the heart. There has been no arrest in connection with the murder, because all attempts to identify the assailant have failed.

In 2001, Dr. Derringer's mother filed a wrongful death and survival action in the D.C. Superior Court, alleging that WMATA, the District, the Authority, Clark, and Smoot breached a duty of care to take security precautions for her son's safety. In particular, Briggs asserted that appellees caused Dr. Derringer's death by leaving the plywood walls in place for too long and failing to adequately illuminate the enclosed area leading into the Mount Vernon Square Metro station. Briggs argued that the plywood enclosure was only necessary during the slurry wall construction phase of the project, which ended prior to August 20, 2000, so the enclosure should not have been in place when her son was killed. She also contended that several lights within the enclosure were not working, leaving the lighting too dim on the night of her son's murder. WMATA removed the case to the federal District Court.

Pursuant to Federal Rule of Civil Procedure 26(a)(2), Briggs designated Ralph W. Witherspoon as an expert witness on safety precautions. In his supplemental report, Witherspoon concluded that appellees

> created a security hazard . . . by erecting 16-foot high wooden barriers . . . that afforded criminals concealment and hiding places; also, by permitting lighting within th[e] enclosure to fall to levels which neither created a deterrence to criminals, nor afforded [individuals within the walkway] the ability to discern potentially threatening persons or situations while still at a distance. In so doing, they violated generally accepted security practices.

Second Supplementation of Plaintiff's 26(a)(2) Statement (filed Jan. 1, 2005) ("Witherspoon Report"), *reprinted in* J.A. 547-48.

In his report and during two depositions, Witherspoon proffered four sources of these "generally accepted security practices." First, he cited Crime Prevention Through Environmental Design ("CPTED") as "an increasingly important

and widely used concept in security design and practice . . . that many security practitioners have used in their work over the years." *Id.* at 548. According to Witherspoon, the CPTED concept focuses on "increasing visibility by occupants and casual observers (police, others) to increase the detection of trespassers or misconduct within the facility." *Id.* (emphasis omitted). Witherspoon also discussed "studies" demonstrating that street lighting decreases crime. *Id.* at 552-53. Third, Witherspoon referred to Occupational Safety and Health Administration ("OSHA") guidelines which he claimed "have been used for years throughout the United States in addressing robbery prevention in a wide variety of retail stores and facilities." *Id.* at 553. Specifically, Witherspoon cited two OSHA recommendations: "Improve Visibility" and "Maintain Adequate Lighting." *Id.* (emphasis omitted). Finally, Witherspoon referred to standards enunciated in WMATA's internal manuals, including specific footcandle lighting requirements. Witherspoon offered nothing to suggest that there are any applicable standards governing when protective fencing should be removed from a construction site.

WMATA, the Authority, Clark, and Smoot moved for summary judgment, asserting various governmental immunities and arguing that Briggs failed as a matter of law to make the heightened showing of foreseeability necessary to impose liability for the intervening criminal act of a third party, establish a standard of care, or prove that any lack of visibility proximately caused Dr. Derringer's death. The District filed a separate motion for summary judgment on substantially the same grounds. After considering Briggs' detailed memoranda responding to each of the arguments, the District Court held that Briggs failed to carry her burden of demonstrating heightened foreseeability. *Briggs*, Civ. No. 01-1876 (D.D.C. Mar. 6, 2006), *reprinted in* J.A. 627-38. Since this conclusion was dispositive, the District Court granted summary judgment for appellees without addressing their other contentions.

## II.   ANALYSIS

### A.  *Standard of Review*

Because it is undisputed that D.C. tort law controls the disposition of this case, the duty of this court "is to achieve the same outcome [that] would result if the District of Columbia Court of Appeals considered this case." *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006).  Under D.C. law, Briggs bore the burden of proving "that the murder was so foreseeable that it became [appellees'] duty to guard against it by adhering to a recognized standard of care, that [appellees] breached that standard of care, and that the failure to exercise due care proximately caused [Dr. Derringer's] death." *Clement v. Peoples Drug Store, Inc.*, 634 A.2d 425, 427 (D.C. 1993); *accord Novak*, 452 F.3d at 907-08.

Summary judgment is appropriate where "'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986) (quoting FED. R. CIV. P. 56(c)).  "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Thus, appellees were entitled to summary judgment, if viewing the evidence in the light most favorable to Briggs, no reasonable jury could find that Briggs established each of the elements of negligence.  *See United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1327 (D.C. Cir. 2005).

We review the District Court's grant of summary judgment *de novo*, *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005), and we "may affirm . . . on a ground not relied upon by the lower court, provided that the opposing party has had a fair

opportunity to [address] that ground," *Washburn v. Lavoie*, 437 F.3d 84, 89 (D.C. Cir. 2006).

**B.** ***Establishment of an Applicable Standard of Care***

    1.   *WMATA Owed No Special Duty to Dr. Derringer by Virtue of a Common Carrier/Passenger Relationship*

Briggs argues that, under District of Columbia law, a common carrier owes a special duty to protect its passengers, and, therefore, she need only establish the foreseeability of the harm against which she alleges WMATA failed to protect Dr. Derringer.  In other words, Briggs contends that she was not required to put on expert testimony to establish the standard of care in this case.  In support of this position, Briggs cites *WMATA v. O'Neill*, 633 A.2d 834, 840 (D.C. 1993) ("A common carrier is required to protect its passengers against assault or interference with the peaceful completion of their journey." (internal quotation marks omitted)).  *O'Neill* relied upon the Restatement (Second) of Torts § 314A(1)(a), which provides, "A common carrier is under a duty to its passengers to take reasonable action . . . to protect them against unreasonable risk of physical harm."  Section 314A is an exception to the Restatement's general rule that "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."  The District Court rejected Briggs' reliance on *O'Neill* and § 314A of the Restatement, holding that, because Dr. Derringer's body was found outside the Metro station entrance, no common carrier/passenger relationship existed between WMATA and Dr. Derringer.  *Briggs*, Civ. No. 01-1876 (D.D.C. Mar. 6, 2006), *reprinted in* J.A. 633 n.7.  We agree.

The controlling case on this point is *McKethean v. WMATA*, 588 A.2d 708 (D.C. 1991).  In that case, the D.C. Court of Appeals held "that WMATA owed [victims who had been

waiting at a bus stop] no duty of care because they were not its passengers at the time they were injured." *Id*. at 712. The court explained that "'[u]ntil a person has placed himself in some substantial sense in the custody or under the control of the carrier, he is not a passenger and no special duty of care is owed him. An intent to become a passenger is not enough to confer that status or to charge the carrier with the duty to exercise that degree of care owed by a carrier in the transportation of a passenger.'" *Id*. (quoting *Baker v. D.C. Transit Sys., Inc*., 248 A.2d 829, 831 (D.C. 1969)). A similar judgment was reached in *Gillot v. WMATA*, 507 F. Supp. 454 (D.D.C. 1981), where the court held that WMATA owed no special duty to a parking lot patron who was abducted while she was on a parking lot owned and maintained by WMATA. *See id*. at 457 ("WMATA owed the Plaintiff the same duty any parking lot owner would owe any parking lot patron."). *O'Neill* is inapposite, because the plaintiff in that case was a passenger riding on a bus. In this case, Dr. Derringer was neither a passenger inside a subway station, nor a passenger riding a subway train.

Briggs argues that, because a Metro farecard was discovered on Dr. Derringer's body, it is fair to assume that he intended to use the Metro. But, as the court noted in *McKethean*, *an intent to become a passenger* is not enough to create a common carrier/passenger relationship. *See* 588 A.2d at 712. Briggs also cites *Robinson v. WMATA*, 676 A.2d 471 (D.C. 1996), where the court treated Robinson as a passenger despite the fact that she had not yet actually passed through the WMATA faregate. But the court tellingly noted that "WMATA [had] not contended that Ms. Robinson was not a Metro passenger to whom it owed a duty of care," *id.* at 473 n.2, so the issue was not joined in that case.

In short, Briggs cites to no authority supporting her claim that Dr. Derringer was a WMATA "passenger" when he was killed. He had not entered the train station and "placed himself

in some substantial sense in the custody or under the control of [WMATA]." *McKethean*, 588 A.2d at 712; *see also* Restatement (Second) of Torts § 314A cmt. c ("The rules [covering common carriers and passengers] apply only where the relation exists between the parties, and the risk of harm, or of further harm, arises in the course of that relation. A carrier is under no duty to one who has left the vehicle and ceased to be a passenger . . . ."). Therefore, he was "not a passenger and no special duty of care [was] owed him." *McKethean*, 588 A.2d at 712.

### 2. *Necessity of Expert Testimony*

Pursuant to the "expert testimony requirement," *District of Columbia v. Hampton*, 666 A.2d 30, 35-36 (D.C. 1995), "'[a] plaintiff must put on expert testimony to establish what the standard of care is if the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson,'" *District of Columbia v. Arnold & Porter*, 756 A.2d 427, 433 (D.C. 2000) (quoting *Messina v. District of Columbia*, 663 A.2d 535, 538 (D.C. 1995)); *accord Butera*, 235 F.3d at 659. "There is, however, a partial exception to this rule," *Hampton*, 666 A.2d at 35: "no expert testimony is needed if the subject matter is within the realm of common knowledge and everyday experience," *Hill v. Metro. African Methodist Episcopal Church*, 779 A.2d 906, 908 (D.C. 2001) (internal quotation marks omitted); *accord Daskalea v. District of Columbia*, 227 F.3d 433, 445 (D.C. Cir. 2000).

Briggs argues that "safety [and] lighting . . . are matters of common knowledge which should not even require expert testimony." Appellant's Br. at 28; *see id.* at 35-36. "At first blush, there is arguably some . . . appeal to [Briggs'] suggestion that the average juror does not require advice from experts" to determine whether lighting must be increased or plywood taken down. *Varner*, 891 A.2d at 266. But such a judgment based on

bare intuition of this sort would be misguided. The D.C. Court of Appeals has required expert testimony in a number of cases that, on first blush, appear to be within the realm of common knowledge. For example, the court has held that the following subjects require expert guidance despite the fact that they might be familiar to jurors: maintenance of leaning trees, *Katkish v. District of Columbia*, 763 A.2d 703, 706 (D.C. 2000); application of hair relaxer, *Scott v. James*, 731 A.2d 399, 400 (D.C. 1999); tightness of handcuffs, *Tillman v. WMATA*, 695 A.2d 94, 97 (D.C. 1997); cushioning for the ground underneath playground monkey bars, *Messina*, 663 A.2d at 538; maintenance of street lights to prevent falling light globes, *Rajabi v. Potomac Elec. Power Co.*, 650 A.2d 1319, 1322 (D.C. 1994); time frame for ordering building materials on a construction project, *Lenkin-N Ltd. P'ship v. Nace*, 568 A.2d 474, 479 (D.C. 1990); response when an arrestee is found hanging in his cell, *Toy v. District of Columbia*, 549 A.2d 1, 7 (D.C. 1988); and installation of "a crosswalk, instead of a stop sign, light, or crossing guard," *District of Columbia v. Freeman*, 477 A.2d 713, 719-20 (D.C. 1984). The case law indicates that the "common knowledge" exception to the expert testimony requirement is recognized only in cases in which everyday experience makes it clear that jurors could not reasonably disagree over the care required. *See, e.g.*, *Bostic v. Henkels & McCoy, Inc.*, 748 A.2d 421, 425-26 (D.C. 2000) (holding that no expert testimony was necessary where boards covering a half block long and three foot wide trench were laid so as to produce a six to seven inch gap between boards); *District of Columbia v. Shannon*, 696 A.2d 1359, 1365-66 (D.C. 1997) (same where child's thumb was ripped out of her hand after getting caught in an open hole in the metal handrail of a playground slide); *Jimenez v. Hawk*, 683 A.2d 457, 462-63 (D.C. 1996) (same where abandoned tank containing used motor oil led to fire).

Moreover, expert testimony is routinely required "in negligence cases . . . which involve issues of safety, security and

crime prevention." *Varner*, 891 A.2d at 267. For example, in a case in which a student, who had been disciplined for various acts of misconduct including repeated major thefts, was not expelled and subsequently murdered two classmates, the D.C. Court of Appeals concluded that "questions as to the appropriateness and sufficiency of academic discipline should not be left to a lay jury to decide without expert testimony." *Id.* Similarly, where a woman was injured as people rushed to leave an event, the court held that "common knowledge and experience . . . is a far cry from any experience with the process of planning for the handling of large crowds in such circumstances." *Hill*, 779 A.2d at 910.

In light of this precedent, we are constrained to hold that expert testimony was required in this case. While lay persons can certainly distinguish between illumination and complete darkness, there is nothing to indicate that common knowledge includes a universal standard of "adequate" lighting within a temporary construction walkway. And at what point safety permits and requires the removal of barriers erected to protect pedestrians is a question involving engineering determinations that are beyond everyday experience. *See Levy v. Schnabel Found. Co.*, 584 A.2d 1251, 1255 (D.C. 1991) (holding expert testimony "undisputedly" required to establish the applicable standard of care for "sheeting, shoring and underpinning" a building during construction). Inquiries of these sorts involve issues of safety, security, and crime prevention with respect to which the D.C. Court of Appeals has repeatedly found unguided resolution by lay persons inappropriate. Whether plywood construction fencing must be replaced with chain link fencing at a particular time and whether the lighting provided within a temporary construction walkway must be increased are not "within the realm of common knowledge and everyday experience." Therefore, Briggs was required to "adduce expert testimony . . . to establish the applicable standard of care." *Varner*, 891 A.2d at 265 (internal quotation marks omitted).

### 3. *Sufficiency of the Expert Testimony Proffered*

Briggs contends that she did in fact produce sufficient expert testimony. In support of this claim, Briggs says that Witherspoon cited "numerous applicable written standards of care" either widely accepted or specific to WMATA. Appellant's Br. at 28-35. However, a careful review of what the law requires and what Briggs offered shows that she failed to meet her burden.

Expert testimony

> is not sufficient if it consists merely of the expert's opinion as to what he or she would do under similar circumstances. Nor is it enough for the expert simply to declare that the [defendant] violated the national standard of care. Rather, the expert must clearly articulate *and reference* a standard of care by which the defendant's actions can be measured. Thus the expert must clearly relate the standard of care to the practices in fact generally followed by other comparable . . . facilities or to some standard nationally recognized by such units.

*Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997) (internal quotation marks and citations omitted). The D.C. Court of Appeals has found "generalized references" to standards insufficient. *District of Columbia v. Moreno*, 647 A.2d 396, 400 (D.C. 1994); *District of Columbia v. Carmichael*, 577 A.2d 312, 315-16 (D.C. 1990). The expert must proffer "a specific, articulable (and articulated) standard of care." *Carmichael*, 577 A.2d at 315; *see Phillips v. District of Columbia*, 714 A.2d 768, 773 (D.C. 1998) ("[T]he expert must testify as to *specific* . . . standards and must relate them directly to the defendant's conduct." (internal citation omitted)). "Absent such testimony, the jury will be forced to engage in idle speculation which is prohibited." *Hughes v. District of Columbia*, 425 A.2d 1299, 1303 (D.C. 1981). And articulation

of a specific standard is essential "[e]specially in circumstances in which . . . the defendant is alleged to have failed to protect the plaintiff from harm." *Varner*, 891 A.2d at 269.

In this case, Witherspoon's report and depositions, when viewed in the light most favorable to Briggs, pointed to no "specific standards" contained in the CPTED concept, cited studies, or OSHA guidelines. Instead, Witherspoon's testimony rested on only generalized objectives. *See Pannell v. District of Columbia*, 829 A.2d 474, 479-80 (D.C. 2003). The only arguably relevant CPTED standard to which Witherspoon pointed is denominated "increasing visibility"; the studies that he cited merely focus on providing street lighting generally; and the OSHA standards upon which he relied suggest that late night retail establishments "Improve Visibility" and "Maintain Adequate Lighting." Witherspoon Report, *reprinted in* J.A. 548, 552-53 (emphasis omitted). None of these recommendations embodies a discernible standard that is applicable to this case. The recommendations, albeit laudatory, are too vague to allow a jury to compare the requirements of a specific "standard" with appellees' conduct. In other words, the material cited by Briggs' expert do not fix standards of behavior that can be used by a jury to assess claims of culpability in this case. The purported standards here are both too general and too vague to satisfy the requirements of D.C. law.

Even when a purported standard sounds like nothing more than "a lofty goal," a party may still satisfy the expert testimony requirement if the expert demonstrates that the purported standard is "not merely a goal but [is] in fact . . . a national standard applicable to [the defendant's] efforts." *National Telephone Coop. Ass'n v. Exxon Mobil Corp.*, 244 F.3d 153, 157 (D.C. Cir. 2001). But an expert must do more than simply state that a purported standard sets a national norm. An expert's "own conclusory opinion," *Pannell*, 829 A.2d at 479, without any showing that the proffered standard "ha[s] been

promulgated, or [i]s generally known," *Messina*, 663 A.2d at 539, is insufficient. Alternatively, an expert may support a purported standard by showing that it has been accepted as controlling in facilities and enterprises that are similar to defendants' facilities or enterprises. *See Clark*, 708 A.2d at 635 (finding that expert who "never testified with any specificity that the standard of care he had in mind was used by other facilities comparable to the Receiving Home" failed to demonstrate an applicable standard of care); *Messina*, 663 A.2d at 539 (same where expert presented "no evidence of the extent to which municipalities or other school systems actually complied, or even attempted to comply, with the [proffered] guidelines"); *Toy*, 549 A.2d at 8 (same where there was "no indication of how many police departments . . . ha[d the] type of emergency equipment [at issue] available").

Witherspoon simply asserted that the CPTED concept is "widely used . . . in security design and practice," and that the OSHA standards "have been used for years throughout the United States in addressing robbery prevention in a wide variety of retail stores and facilities." Witherspoon Report, *reprinted in* J.A. 548, 553. These unsupported claims do not demonstrate a national standard. Indeed, in his deposition, Witherspoon acknowledged that there is no national security standard for lighting. And there is nothing in his testimony that even vaguely suggests a standard covering the appropriate timing for the removal of construction fencing. He stated that he could not recall whether any of the cases on which he previously had served as an expert witness involved a construction company, and he confirmed that none of them featured a local traffic authority. In short, Witherspoon failed to establish that the vague goals provided by the CPTED concept, studies, and OSHA guidelines have been implemented by similar entities or achieved nationwide acceptance.

"Nor can [Briggs] prevail on the basis of the provisions in the [WMATA manuals]. . . ." *Varner*, 891 A.2d at 269. The D.C. Court of Appeals has held that such internal policies – standing alone – cannot demonstrate the applicable standard of care. *See Clark*, 708 A.2d at 636-37 ("In essence, plaintiff's case here is based upon the proposition that the District deviated from its own Plan. That is simply not enough."); *see also Varner*, 891 A.2d at 269-70; *WMATA v. Young*, 731 A.2d 389, 398 (D.C. 1999) ("[C]ompany rules are not 'conclusive' or 'wholly definitive' . . . ."). While internal regulations may be "admissible as *bearing on the* standard of care," admission at trial of the WMATA manuals alone would be insufficient, "because expert testimony [would still be] required to establish that the [manuals] . . . embod[y] the national standard of care and not a higher, more demanding one." *Clark*, 708 A.2d at 636; *see also Rajabi*, 650 A.2d at 1322 (holding that a contractual "maintenance schedule itself did not define the standard of care"). "'To hold otherwise would create the perverse incentive for [WMATA] to write its internal operating procedures in such a manner as to impose minimal duties upon itself in order to limit civil liability rather than imposing safety requirements upon its personnel that may far exceed those followed by comparable institutions.'" *Arnold & Porter*, 756 A.2d at 435 (quoting *Clark*, 708 A.2d at 636); *see Varner*, 891 A.2d at 272 ("Aspirational practices do not establish the standard of care which the plaintiff must prove in support of an allegation of negligence.").

On the record before us, we conclude that Briggs' expert offered only his own opinion in attempting to describe national standards that might be applicable to establish standards of care in this case. This is insufficient under D.C. law. *Varner*, 891 A.2d at 269; *National Telephone*, 244 F.3d at 157. Because failure to establish a standard of care is "fatal to a negligence claim," *Scott v. District of Columbia*, 101 F.3d at 757, appellees were entitled to summary judgment. We may affirm on the

basis of this conclusion alone, since Briggs fully developed and briefed this required element of her claim. We thus have no need to address appellees' arguments with respect to the remaining elements of negligence, their assertions of immunity, and the District's contention that it cannot be held liable under either an agency or a landowner theory. *See Odebrecht Contractors*, 393 F.3d at 1327 (refraining from addressing additional arguments after making a dispositive conclusion); *Moreno*, 647 A.2d at 401 (same).

### III. CONCLUSION

For the reasons stated in this opinion, we affirm the judgment for appellees.

*So ordered.*