# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 12, 2014          Decided December 19, 2014

No. 13-7077

DARLENE C. ROBINSON,
APPELLANT

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00723)

*Charles C. Parsons* argued the cause and filed the briefs for appellant.

*Kathleen A. Carey* argued the cause and filed the briefs for appellees. *Mark F. Sullivan* entered an appearance.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit Judge*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*:  A bus driver, one Mr. Bumpass, hits the brakes as he approaches a stop sign.  The plaintiff, a passenger on the bus, falls backward and breaks her leg.  The question on appeal is whether, in light of the evidence presented at trial, a reasonable jury could find the bus company liable for the plaintiff's injury.  Applying the common law of the District of Columbia, we affirm the district court's conclusion that a reasonable jury could not.

I

On the morning of April 16, 2008, Darlene Robinson boarded a Washington Metropolitan Area Transit Authority (WMATA) bus at the Gallatin and 11th Street stop in Northeast Washington, D.C.  She paid her fare and proceeded past bus driver Ronald Bumpass.  Robinson continued down the aisle, gripping the seat-back handrails as she went.  Bumpass closed the doors and began driving away from the stop.  Shortly thereafter, Bumpass hit the brakes as he approached a stop sign on Gallatin Street.  As the bus decelerated, Robinson -- who was still standing, facing the back of the bus -- lost her grip on a handrail, fell in a twisting motion, "landed on [her] . . . backside," and broke her left leg.  J.A. 514 (Robinson Testimony).

Robinson sued WMATA, alleging that Bumpass' negligent operation of the bus caused her injury and that WMATA was responsible.[1]  At trial, Robinson sought to prove Bumpass' negligence on two theories.  First, she sought to show that he

---

[1]Robinson's complaint named WMATA and "Bus Driver John Doe" as defendants.  J.A. 37.  Although Robinson reserved the right to amend her complaint when she learned the driver's identity, she did not do so.  The parties have proceeded on the understanding that WMATA is the sole defendant, and so do we.

violated WMATA's standard operating procedures (SOPs). Second, she sought to show that the "jerk" caused by Bumpass' application of the brakes was of such extraordinary force that his negligence could be inferred.

In support of her claim that Bumpass was negligent because he violated WMATA's SOPs, Robinson presented the expert testimony of Dr. Carl Berkowitz, a public transportation safety engineer. Dr. Berkowitz testified that the National Academy of Sciences and the U.S. Department of Transportation fund research studies to address transportation safety issues, and that the results and recommendations from those studies "emanate[]" and "filter[] down" to "all the major transit agencies." J.A. 270-71. According to Berkowitz, those results and recommendations have led to nationally agreed-upon safety standards that all major cities in the United States, including the District of Columbia, have implemented.

Dr. Berkowitz then identified two WMATA SOPs relevant to this case, and stated that each reflected the national standard of care for city bus travel. First, a WMATA bus driver is required to check his or her rearview mirror before departing from a stop to confirm that all passengers are "secure" and "prepared for vehicle movement." J.A. 938, 941. Second, a WMATA bus driver is instructed to start the bus "gradually" and stop the bus "smoothly." J.A. 942-43.

Counsel for WMATA asked Dr. Berkowitz where and when these national standards for safe bus travel were articulated. Berkowitz replied that they were "developed from research, which actually dates back to Hammurabi -- the Hammurabi Code -- I guess [that] would be 3,500 years ago." J.A. 458. He also said that the "first major research in this area[] was in the book of Deuteronomy." *Id.*

To establish that Bumpass violated the SOPs identified by Dr. Berkowitz, Robinson called Bumpass himself to the stand. Bumpass admitted that he did not check his mirror before leaving the stop that morning. He knew there were several open seats up front, he said, and he assumed Robinson had sat down by the time he closed the doors and started driving. J.A. 667-68.

In support of her alternative theory -- that Bumpass' negligence was shown by the fact that his braking had caused the bus to jerk with extraordinary force -- Robinson took the stand to testify that the bus was going "fast, faster than normal buses," J.A. 513, and that it "was jerking and then [there] was an abrupt stop," J.A. 528. The abrupt stop, she testified, caused her to lose her grip on the handrail and fall. J.A. 528-29.

Robinson also presented the expert testimony of Dr. Jamie Williams, a biomedical engineer, to explain how the force of the bus' movements caused her to lose her grip on the handrail and fall down. Dr. Williams testified that a torsional force on Robinson's left lower leg, brought about by the deceleration of the bus, caused her leg to break. Williams estimated that, based on the maximum grip strength of a woman of similar age and weight as Robinson, the "deceleration that would have destabilized her" would have been roughly ".38 times gravity." J.A. 207. When asked on cross-examination if she had any information relating to the actual strength of Robinson's grip that day, Dr. Williams acknowledged that she did not. She testified that her conclusions were premised on the assumption that Robinson had been holding onto the handrail as tightly as she possibly could. J.A. 227-28.

At the close of Robinson's case and again at the conclusion of all of the evidence, WMATA moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The district court reserved ruling on those motions and submitted the case to

the jury, which returned a verdict for Robinson and awarded her $404,713.28 in damages. Thereafter, the court granted WMATA's renewed motion for judgment as a matter of law under Rule 50(b). *Robinson v. WMATA*, 941 F. Supp. 2d. 61 (D.D.C. 2013).

In granting judgment as a matter of law in favor of WMATA, the court rejected Robinson's effort to prove negligence through the violation of WMATA's standard operating procedures. The court concluded that Dr. Berkowitz had failed to show that either of the two SOPs reflected national standards of care; that there was no evidence of "a causal connection between the driver's failure to check the internal center mirror and [Robinson's] injury," *id.* at 69 n.5; and that the "start gradually and stop smoothly" SOP could not serve as a negligence standard because to treat it as such "would be inconsistent with District of Columbia law," *id.* at 71. The court also rejected Robinson's theory that Bumpass' negligence could be inferred from the bus' jerk, concluding that the evidence was insufficient to show that the jerk was of an extraordinary nature.

Robinson filed a timely appeal, and that appeal is now before us.

II

We must affirm a Rule 50(b) judgment as a matter of law "if, after viewing the evidence in the light most favorable to the non-moving party and drawing all reasonable inferences, it is clear that a reasonable jury could only have found for the moving party." *Johnson v. WMATA*, No. 90-7027, 1991 WL 214174, at *2 (D.C. Cir. 1991); *see Conseil Alain Aboudaram, S.A. v. de Groote*, 460 F.3d 46, 50 (D.C. Cir. 2006). Federal jurisdiction over this lawsuit arises under the WMATA

6

Compact. *See* D.C. Code § 9-1107.01(81).[2] The Compact provides that WMATA shall be liable for the torts of its employees "in accordance with the law of the applicable signatory," *id.* § 9-1107.01(80), which in this case is the District of Columbia.[3] The tort law of the District of Columbia therefore controls our disposition, *Briggs v. WMATA*, 481 F.3d 839, 843 (D.C. Cir. 2007), and we must aim "to achieve the same outcome [that] would result if the District of Columbia Court of Appeals considered this case," *id.* (quoting *Novak v. Capital Mgmt. & Dev. Corp.*, 452 F.3d 902, 907 (D.C. Cir. 2006)).

In *Johnson v. WMATA*, we suggested that there are (at least) two theories under which a plaintiff may recover in a bus negligence case against WMATA. 1991 WL 214174, at *1. First, a plaintiff may present direct evidence of negligence. For example, evidence that a bus driver let himself be distracted while driving can be sufficient to recover. *See Sibert-Dean v. WMATA*, 721 F.3d 699, 701 (D.C. Cir. 2013) (affirming a finding of negligence where the driver turned to look at teenage girls). Evidence that a driver violated an applicable standard of care can likewise be sufficient. *See WMATA v. O'Neill*, 633 A.2d 834, 841 (D.C. 1993). Second, a plaintiff may offer circumstantial evidence of negligence by showing that the driver caused a jerk "so violent or extraordinary that it could not have been consistent with safe operation of the bus." *Johnson*, 1991

---

[2]The Compact -- an interstate agreement among the District of Columbia, Maryland, and Virginia -- created WMATA. *See* Pub. L. No. 89-774, 80 Stat. 1324 (1966) (codified as amended at D.C. Code § 9-1107.01 *et seq.*). Section 81 of the Compact provides that federal district courts shall have original jurisdiction, concurrent with the state courts of the three signatories, "of all actions brought by or against" WMATA. D.C. Code § 9-1107.01(81).

[3]WMATA does not dispute that it is liable for Robinson's injury if Bumpass was negligent and if that negligence caused the injury.

WL 214174, at *2 (citing *Boyko v. WMATA*, 468 A.2d 582, 584 (D.C. 1983)).

The question on this appeal is whether Robinson presented sufficient evidence for a reasonable jury to find negligence under either theory. We address the direct evidence theory in Part III and the circumstantial evidence theory in Part IV.

III

Under District of Columbia law, a plaintiff seeking to prove her case through direct evidence of negligence has the burden of establishing three elements: (1) "the applicable standard of care"; (2) "a deviation from that standard by the defendant"; and (3) "a causal relationship" between the deviation and the injury she suffered. *Varner v. District of Columbia*, 891 A.2d 260, 265 (D.C. 2006). To prove her case on this theory, Robinson argued that WMATA's check-your-mirror and "start gradually, stop smoothly" SOPs constituted applicable standards of care; that Bumpass deviated from those standards; and that her injury was the consequence of those deviations. On appeal, she challenges the district court's conclusion that she failed to establish that either of the SOPs constituted an applicable standard of care and, moreover, that she failed to show that the deviation from the check-your-mirror SOP caused her injury. We address the district court's analysis of each SOP below.

A

Under the check-your-mirror SOP, a WMATA bus driver is expected to check his rearview mirror and "[m]ake sure all passengers are secure before moving the bus." J.A. 938. According to Robinson's expert, Dr. Berkowitz, "secure" means

that the passengers "are holding on to something." J.A. 442.[4] The district court concluded both that Berkowitz's testimony was insufficient to show that this SOP constituted a national standard of care in the public transportation industry, and that Robinson failed to show that violation of the SOP caused her injury.

Ordinarily, the applicable standard of care is the traditional reasonable person standard, which the "jury can ascertain . . . without the aid of expert testimony." *Godfrey v. Iverson*, 559 F.3d 569, 572 (D.C. Cir. 2009). But where "the subject in question is so distinctly related to some science, profession or occupation as to be beyond the ken of the average layperson," the plaintiff must proffer expert testimony to establish the applicable standard of care. *Id*. (internal quotation marks omitted); *accord Varner*, 891 A.2d at 265. Put differently, an expert is necessary unless the subject matter is "within the realm of common knowledge and everyday experience" of average jurors. *Godfrey*, 559 F.3d at 572 (internal quotation marks omitted).

When an expert witness is required, the expert must "clearly articulate and reference a standard of care by which the defendant's actions can be measured." *Varner*, 891 A.2d at 269 (internal quotation marks and emphasis omitted). Especially in cases involving safety standards, the expert must also show that

---

[4]Dr. Berkowitz had initially tried to testify that the national standard of care required passengers to be *seated* before a bus driver started driving. But the district court barred that testimony on the ground that WMATA has an express policy permitting passengers to stand while riding a bus, and that this policy constitutes a "discretionary decision" that is "shielded from suit" under § 80 of the WMATA Compact. *Robinson v. WMATA*, 858 F. Supp. 2d 33, 37 (D.D.C. 2012). Robinson does not appeal that ruling.

the particular practice at issue reflects a *national* standard of care. *See, e.g.*, *Novak v. Capital Mgmt. & Dev. Corp.*, 570 F.3d 305, 313 (D.C. Cir. 2009); *Briggs*, 481 F.3d at 846-47; *Clark v. District of Columbia*, 708 A.2d 632, 635 (D.C. 1997). An expert's personal opinions or "unsupported assertion[s] as to the national standard of care" are insufficient. *Clark*, 708 A.2d at 635. Further, although internal agency manuals such as WMATA's standard operating procedures may provide evidence bearing on the standard of care, they do not, on their own, establish the national standard. *Briggs*, 481 F.3d at 848; *Varner*, 891 A.2d at 269. Rather, the expert must show that the practices to which the agency has committed reflect "the national standard of care and not a higher, more demanding one." *Clark*, 708 A.2d at 636.

Robinson argues, first, that the district court improperly required her to establish the standard of care via an expert witness. Indeed, we seriously doubt that determining whether it is reasonable to start a motor vehicle without checking to make sure one's passengers are secure is outside "the realm of common knowledge and everyday experience" of average jurors. *Godfrey*, 559 F.3d at 572; *see, e.g.*, *O'Neill*, 633 A.2d at 841 & n.14 (holding that an expert was not required to establish that a WMATA bus driver should have alerted the police when two drunk men loudly threatened and later assaulted another passenger aboard a Metrobus); *WMATA v. Young*, 731 A.2d 389, 396 (D.C. 1999) (holding that whether a bicyclist "was able to avoid colliding with" a city bus is not "beyond the ken of the average layperson") (internal quotation marks omitted); *cf.* BOB DYLAN, *Subterranean Homesick Blues*, *on* BRINGING IT ALL BACK HOME (Columbia Records 1965) ("You don't need a weatherman to know which way the wind blows.").

The problem is that Robinson forfeited this argument. The district court's first opinion in this case, denying WMATA's

motion for summary judgment, indicated that an expert was required to establish the standard of care because the subject was "beyond the ken of the average layperson." *Robinson v. WMATA*, 858 F. Supp. 2d 33, 39 (D.D.C. 2012) (internal quotation marks omitted). Robinson did not demur. When WMATA moved for judgment as a matter of law at the close of Robinson's case,[5] the court again opined that "there has to be expert testimony about the national standard of care," J.A. 603-04, and Robinson did not disagree. In accordance with its expressed view, the court then instructed the jury that, "You can only determine the standard of care required of WMATA from the testimony of the expert witnesses regarding that standard." Jury Instructions 36, § 9.08. Again, Robinson did not object. Finally, when WMATA filed a renewed motion for judgment as a matter of law after the verdict, maintaining that an expert was required because the question was "beyond the ken of the average layperson," J.A. 796, Robinson did not object on that ground.

A "fundamental principle of appellate review generally bars a party who failed to preserve an argument in a lower tribunal from raising it on appeal absent plain error or exceptional circumstances." *Bahlul v. United States*, 767 F.3d 1, 9 (D.C. Cir. 2014) (en banc); *see Salazar ex rel. Salazar v. District of Columbia*, 602 F.3d 431, 434 (D.C. Cir. 2010). We detect no exceptional circumstances here. And because District of Columbia courts have required expert testimony in many cases that, "on first blush, appear to be within the realm of common knowledge," *Briggs*, 481 F.3d at 845, we cannot find that it was plain error to require expert testimony to establish the standard of care in this case. *See id.* (citing decisions requiring experts in cases involving the maintenance of leaning trees, the tightness

---

[5]WMATA renewed that motion, by incorporation, at the conclusion of all of the evidence.

of handcuffs, the maintenance of street lights, and the choice between a crosswalk and a stop sign); *Burke*, 685 F.3d at 1106 n.2 (same).

Robinson argues, second, that her expert's testimony was in any event sufficient to establish that WMATA's check-your-mirror SOP reflected a national standard. We admit to being tempted to delve more deeply into the question of whether this SOP really "developed from research, which actually dates back to Hammurabi" and "the book of Deuteronomy." J.A. 458.[6] But we need not resolve that question either. Whether or not Dr. Berkowitz successfully showed that the check-your-mirror SOP reflected a national standard, this negligence theory suffers from an independent ailment: lack of causation.

As the district court correctly found, "Robinson did not introduce any evidence supporting a causal connection between the driver's failure to check the internal center mirror and her injury." *Robinson*, 941 F. Supp. 2d. at 69 n.5. If Bumpass had looked in the mirror, what would he have seen? According to Robinson's testimony, he would have seen that she was holding onto a handrail, J.A. 512 -- exactly what Dr. Berkowitz testified the standard of care required him to confirm before moving the bus, *see* J.A. 442. Accordingly, had Bumpass followed the SOP, he would have done just what he did do -- move the bus -- and hence any deviation from the standard could not have caused Robinson's injury.

At oral argument, Robinson's counsel attempted to remedy this fatal shortcoming by asserting that Robinson was not

---

[6] *Cf.* CODE OF HAMMURABI § 197 (L.W. King. trans. 1915) (c. 1780 B.C.), *available at* http://www.fordham.edu/halsall/ancient/hamcode.asp ("If he break another man's bone, his bone shall be broken.").

actually secure because she was only holding onto a seat-back handrail, as opposed to one of the bus' vertical poles. Oral Arg. Recording at 16:49-17:26. But Dr. Berkowitz never testified that a passenger would not be considered "secure" unless she were holding on to a vertical pole (as opposed to a handrail). To the contrary, his testimony indicated that a passenger holding onto a handrail *would* be considered secure. J.A. 442 (stating that "we want to make sure that [passengers] are *holding on to something*") (emphasis added). Therefore, Robinson failed to establish "a causal relationship between [Bumpass'] deviation and [her] injury." *Varner*, 891 A.2d at 265.[7]

B

Robinson's effort to prove negligence by establishing a violation of the "start gradually, stop smoothly" SOP fares no better.

First, Robinson's argument that an expert was not required to establish this SOP as the standard of care fails for the same reason we identified above: She did not object to the jury instruction that required expert testimony to show that a WMATA operating procedure evidenced a national standard of

---

[7]There is a second causation problem as well. The SOP in question says that a driver should check the mirror before moving the bus; it says nothing about checking before stopping the bus. But Robinson did not fall when the bus first began moving; she fell only as it came to a stop. Robinson argues that Bumpass' start and subsequent stop were "packed into just seven seconds," Robinson Br. 29, suggesting that his failure to look in the mirror at the start had an effect that continued through the stop. In light of the causation problem identified in the text, we need not consider whether this argument is sufficient to bridge the gap between the start and the stop.

care.  And as we said, that instruction did not constitute plain error.

Second, as the district court found, WMATA cannot be liable for violations of the "start gradually and stop smoothly" SOP because that "would be inconsistent with District of Columbia law." *Robinson*, 941 F. Supp. 2d. at 71.  As we discuss in Part IV, WMATA is not liable under District law for the normal jerks and jolts commonly associated with bus travel. *Johnson*, 1991 WL 214174, at \*2; *Fells*, 357 A.2d at 395; *see Connor v. Wash. Ry. & Elec. Co.*, 43 App. D.C. 329, 333-34 (D.C. 1915).  Much more is required than merely failing to start gradually or stop smoothly.  Rather, the common law of the District requires evidence that a jerk was of "extraordinary" force before an abrupt stop may be taken as proof of negligence. *See Johnson*, 1991 WL 214174, at \*2; *Fells v. WMATA*, 357 A.2d 395, 395 (D.C. 1976).  Accordingly, whether or not the "start gradually, stop smoothly" SOP reflects a nationally accepted practice, it cannot be the standard of care for purposes of a negligence action governed by District of Columbia tort law.  Robinson cannot recover against WMATA merely by showing that Bumpass did not achieve a gradual start or a smooth stop.

IV

What remains is Robinson's alternative argument that she provided circumstantial evidence of negligence by showing that the bus driver caused a jerk "so violent or extraordinary that it could not have been consistent with safe operation of the bus." *Johnson*, 1991 WL 214174, at \*2 (citing *Boyko*, 468 A.2d at 584; *Fells*, 357 A.2d at 395-96).  A plaintiff may pursue damages under this theory of liability without introducing expert testimony regarding the standard of care.  *See, e.g.*, *Brighthaupt*

*v. WMATA*, No. 97-7217, 1998 WL 794814, at *1 (D.C. Cir. 1998).

As we have just noted, WMATA is not liable for the normal "jerks or jars" that occur during city bus rides. *Fells*, 357 A.2d at 395 (quoting *D.C. Transit System, Inc. v. Perry*, 337 A.2d 224, 225 (D.C. 1975)). "Because 'jerks' occur often in the normal operation of a bus, evidence of a jerk that resulted in injury is not usually enough for a jury to infer negligence. If it were, WMATA could be held liable for many common accidents that are no fault of the driver." *Johnson*, 1991 WL 214174, at *2. Instead, a plaintiff may "recover against the bus company only by showing 'that the "jerk" or "sudden start" was of such unusual and extraordinary force that it could not reasonably be said to have happened in the ordinary operation of the vehicle.'" *Boyko*, 468 A.2d at 583-84 (quoting *Wiggins v. Capital Transit Co.*, 122 A.2d 117, 118 (D.C. 1956)); *see Brighthaupt*, 1998 WL 794814, at *1.

Such "'unusual and extraordinary force,'" the District of Columbia Court of Appeals has said, "cannot be inferred from 'mere descriptive adjectives and conclusions' alone." *Boyko*, 468 A.2d at 584 (quoting *Wiggins*, 122 A.2d at 118). Rather, reviewing courts must focus on "the substance of the testimony, not on its grammatical form." *Id.* The critical question "is whether the testimony, in whatever form it is offered, describes movement that is 'consistent with proper operation of the bus.'" *Id.* (quoting *WMATA v. Jones*, 443 A.2d 45, 50 (D.C. 1982) (en banc)).

In *Boyko*, for example, the plaintiff testified that the bus' jerk was "'abrupt,'" "'violent,'" and "unlike what she had come to expect in her fifty years of riding buses." 468 A.2d at 584-85. Her treating physician further testified that "her injury was one that 'takes a considerable amount of violence.'" *Id.* at 583.

Finally, the bus driver admitted that, "when she pulled away from the stop, she knew that the floor was wet and that appellant had not yet reached a seat." *Id.* Taken together, this testimony was sufficient to send the case to a jury. *Id.* at 585. In *Johnson*, by contrast, a witness' statement that a bus' jerk "wasn't normal" was insufficient. 1991 WL 214174, at *2. Likewise insufficient was the testimony of Johnson's doctor, who "did not testify that the injury could only have been caused by a violent motion of the bus." *Id.*

In support of her claim that her bus experienced an extraordinary and violent jerk, Robinson testified that the bus was going "fast, faster than normal buses," J.A. 513, and that it "was jerking and then [there] was an abrupt stop," J.A. 528. When asked how fast the bus was moving, Robinson said: "I was not facing the driver, so I wasn't aware of the speed. But I could see the trees at the park going by swiftly as I was proceeding to a seat." J.A. 513. The abrupt stop, she testified, caused her to lose her grip on the handrail and fall. J.A. 528-29.

As an initial matter, we reject WMATA's contention that Robinson's testimony was insufficient merely because no other witness corroborated it. It is true that plaintiffs who recover under this theory often present testimony of non-party witnesses who can in some manner corroborate the extreme nature of the bus' jerk. *See, e.g.*, *Boyko*, 468 A.2d at 585; *Brighthaupt*, 1998 WL 794814, at *1. But the District of Columbia cases do not hold that a plaintiff cannot recover on the basis of her testimony alone. To the contrary, as the *Boyko* court observed, if WMATA is arguing that there is "some fancied defect in . . . the self-evident interest of a party in the outcome of the case, it is unpersuasive." 468 A.2d at 584.

Nonetheless, we agree with the district court that Robinson's testimony "does not give rise to an inference that the

deceleration was 'of such unusual and extraordinary force that it could not reasonably be said to have happened in the ordinary operation of the vehicle.'" *Robinson*, 941 F. Supp. 2d at 73 (quoting *Boyko*, 468 A.2d at 584). The strongest part of her testimony -- that the bus was traveling "fast, faster than normal buses" -- is not enough to recover on this theory. *See Boyko*, 468 A.2d at 584 (distinguishing as insufficient such testimony in *Perry*, 337 A.2d at 225, where the plaintiff described the bus' movement as "unusually fast"). Robinson acknowledged that she "wasn't aware of the [bus'] speed," J.A. 513, and she provided no context for what she meant by "normal." Traveling faster than "normal" does not mean that the movement was inconsistent with safe or proper operation, let alone that the stop was. Nor was Robinson's testimony -- that the bus' movement was "jerking" and the stop "abrupt" -- inconsistent with a description of the jerks and jolts that commonly occur aboard city buses. *See Fells*, 357 A.2d at 395. Under District law, "'testimony of a sudden stop and resulting injuries does not, by itself, raise a permissible inference of negligence.'" *Boyko*, 468 A.2d at 584 (quoting *Fells*, 357 A.2d at 395-96); *cf. Wiggins*, 122 A.2d at 118 (noting that "statements that a street car 'started violently,' 'started with a violent jerk,' . . . and the like, are not of themselves sufficient to show negligent operation" (citation omitted)).

The testimony of Robinson's biomedical expert, Dr. Williams, does not rescue her case. Dr. Williams was not Robinson's treating physician and never talked to her. J.A. 243. Williams did testify that, assuming Robinson was holding the handrail with the maximum grip strength of a woman of similar age and weight, the "deceleration that would have destabilized her" would have been about ".38 times gravity." J.A. 207. But assuming that ".38 times gravity" constitutes an extraordinary or violent force (no evidence was offered on the point), there was no testimony that Robinson was capable of exerting the

maximum grip strength of a woman of her age and weight, and no testimony that she was holding on as tightly as she could. Indeed, Dr. Williams acknowledged that she had no information at all regarding how tightly Robinson was actually holding the handrail, and agreed that, if Robinson were "not holding onto the hand hold with everything she's got, it would take less . . . deceleration to disrupt her grip." J.A. 227-28. As a consequence, Williams' testimony left the jury unable to do anything more than speculate about the actual force of the stop. And "[s]ufficiency of the evidence to support a claim for relief may not be established by jury speculation." *Milone v. WMATA*, 91 F.3d 229, 232 (D.C. Cir. 1996).

In sum, because Robinson's testimony was "consistent with proper operation of the bus," and because a jury could only infer from Dr. Williams' testimony "that it was *possible* that Ms. Robinson's injury resulted from significant force," *Robinson*, 941 F. Supp. 2d at 73-74 (internal quotation marks omitted), the district court properly granted judgment as a matter of law in favor of WMATA.

V

For the foregoing reasons, we conclude that neither of the two negligence theories proffered by the plaintiff was supported by evidence sufficient to sustain a jury verdict in her favor. The judgment of the district court is therefore

*Affirmed.*